Argued May 31; reversed June 29; rehearing denied
September 11, 1945

IN RE LOBB'S WILL
LYONS ET AL. *v.* WILSON ET AL.
(160 P. (2d) 295)

Before BELT, Chief Justice, and KELLY, BAILEY, LUSK and HAY, Associate Justices.

· *Francis F. Yunker,* of Portland, for contestants-appellants.

*W. C. Bristol,* of Portland, for respondents. ·

HAY, J.

This proceeding in contest of the will and codicil of Josephine M. Lobb, deceased, is now, for the second time, before this court on appeal. It was instituted by Mrs. Lobb's heirs at law against S. F. Wilson, who, under the will, was residuary legatee and executor-nominate and, under the codicil, became sole beneficiary. The contest was based upon the ground of undue influence alleged to have been exercised over Mrs. Lobb by Mr. Wilson. A hearing was had, at which the will and codicil were proved in solemn form, after which the contestants offered evidence tending to establish their charges of undue influence. Thereupon, on motion of counsel for proponent, Mr. Wilson, the court dismissed the contest for failure of proof. On appeal, this court held that such dismissal was error. We were of the opinion that contestants had established a prima facie case; that the evidence indicated that there existed between Mrs. Lobb and Mr. Wilson, at the time of the execution of the will and of the codicil, a confidential relationship; that Mrs. Lobb was susceptible to influence; and that Mr. Wilson participated actively in the preparation of the will. The existence of the confidential relationship, and the activity of Mr. Wilson in the premises, we felt, justified such an inference of undue influence as to impose upon him the burden of showing that in fact no such influence was used. We, therefore, remanded the cause for further proceedings. For a more detailed statement, we refer to our former opinion. (*In re Lobb's Will*, 173 Or. 414, 145 P. (2d) 808.)

Thereafter, a further hearing was had before the probate court, at which the proponent presented in his behalf the testimony of himself and of other wit-

nesses. Thereafter, the court dismissed the contest, and contestants have appealed. The transcript of the additional testimony taken comprises some six hundred pages. All of this, besides numerous exhibits introduced both by proponent and by contestants we have painstakingly read and considered, and we have, moreover, in the light of the additional evidence, carefully reconsidered our original opinion.

While all of the evidence has been considered, in our opinion much of it was broadly irrelevant to the issues, and, for the purposes of this opinion, we confine ourselves to a statement of that which, in our judgment, had evidentiary force and probative value.

The evidence for proponent was as follows: Mr. Wilson testified that he had been a resident of Oregon since 1907. After coming to Oregon, he practiced law in Pendleton for five years, and since then has practiced in Portland. For about ten years, ending some time between 1925 and 1927, he was executive manager in Portland of Bankers' Discount Corporation. He first met Mrs. Lobb some time in 1934, when he represented a person who was anxious to buy some property in which she had an interest. Thereafter, in January, 1935, she consulted him with reference to effecting a sale of her Portland residence property. Subsequently, she sought his advice in relation to litigation in which she had become involved in California. He represented her in the collection of delinquent rental from her California property. After the California litigation was finally determined, she desired him to sell the California land for her, which he attempted to do. This was probably in 1938. An offer to purchase the property was received, but, against his advice, Mrs. Lobb refused it. The property was after-

wards sold for delinquent taxes, but was later redeemed, and it was finally sold by Mrs. Lobb for considerably less than the first offer, on August 1, 1941. Between business contacts, Mr. Wilson had no social contacts with Mrs. Lobb. He never called on her except when she requested him to do so, and his communications with her were nearly always by correspondence. Some of the correspondence is in evidence and is unexceptionable in tenor. Mr. Wilson never suggested that Mrs. Lobb should invest her moneys in oil, mining stocks, or anything else. His whole effort was to try to assist her in realizing something from unfortunate investments which she had already made, or which her late husband had made. He never suggested that she should make a will. A few days prior to April 22, 1939, in response to a telephone communication, he went to Hillsboro and had a conference with Mrs. Lobb, who told him that she desired to have him prepare her will. "To his amazement", she said that she wanted to make him one of her beneficiaries. She detailed particularly the provisions which she wished to have incorporated in the will. Mr. Wilson told her that he did not think that she ought to make such a will, and that, in his opinion, her relatives should have whatever property she might have left. Mrs. Lobb then gave him her reasons why she did not feel under any obligation to her relatives. He mentioned particularly that she stated that, upon one occasion, she had gone to Berkeley, California, to live with her nephew, Charles Ward, one of the contestants. She tried to get him to look after her California property, and said, if he had done so, she would have made him a very substantial beneficiary under her will. However, after a few weeks, "they made the home so intolerable for her that she had to leave."

She spoke highly of Ward and appeared to blame Mrs. Ward for the incident.

Mr. Wilson had no expectation of being a beneficiary under Mrs. Lobb's will. He was not conscious of having done any act that was calculated, deliberately or otherwise, to influence her unduly. He denied being a frequent caller at places where she resided. He denied that he ever offered Mrs. Lobb a fur coat or that he kissed her, and stated that those were stories which "somebody manufactured".

We quote from his testimony with reference to the actual preparation of the will:

"A. * * * she told me what she wanted, and I told her I couldn't draw the will, and I told her, as I have already related, what I thought she ought to do, and she gave me the reasons that I related why she wasn't going to do it; and then she said 'Couldn't you get somebody to draw the will?' and because I knew you (Mr. Bristol) had been handling part of her business, I suggested you. She hesitated a little bit and said 'Couldn't you get that young man that has an office next door to you?' and I said I might, and that's the way it happened. Q. Then she herself expressed a preference for Mr. Clark, is that right? A. She requested it, yes. Q. Now, did you send Clark out there? A. I did not; I just reported what she said. * * * Q. Did you, in talking with Mr. Clark about what Mrs. Lobb wanted, did you repeat to him honestly and squarely what Mrs. Lobb had told you, or did you put your own ideas into that will? A. I repeated what she told me, and also told him that she had suggested him. * * * Q. Was there any combination between you two fellows to influence that old lady? A. None whatever. Q. Against her free and voluntary disposition and acts? A. None whatever. Q. Did you ever become aware at any time,

now, of any cause, direct or remote, that induced her to make a will with you as a named beneficiary? A. Never did.''

Mr. Wilson's law practice was confined principally to office work. He had an arrangement with Mr. Edward J. Clark, under which Mr. Clark, on a rental basis, occupied one room in Mr. Wilson's suite of offices, with the use of a common reception room. Mr. Clark also had the privilege of using the services of Mr. Wilson's stenographer, making his own arrangements with her as to compensation. This arrangement had existed for about a year before the Lobb will was executed.

Mr. Wilson first met Marian Fouse some time after April 22, 1939, (the date of the will) on an occasion when Mrs. Lobb brought her to his office. Neither Marian Fouse nor her mother ever participated in any conference that he had with Mrs. Lobb. He stated that he never took gifts or presents to Mrs. Lobb to influence her in any way favorably to himself. He sent her flowers during the holidays once or twice, and once, at her request, procured a bottle of sherry for her, for which she paid. On another occasion, he gave her a bottle of wine. He did not enter the apartment, but merely handed her the bottle of wine at the door, wished her the compliments of the season, and went away. He denied specifically testimony that, for three weeks prior to January 10, 1942, he visited in Mrs. Lobb's apartment every day, branding that statement as being absolutely false. He said he knew nothing of the codicil to Mrs. Lobb's will having been prepared by Miss Bruns, his secretary, until the latter "showed me the form of it and said that Clark was away, and she wanted to know if that was all right,

and I told her that as far as I could see, the form looked all right''. He denied ever having seen the will before Mrs. Lobb executed it.

A number of bank checks and statements were introduced in evidence, covering a period from July, 1941, through January 3, 1942. The checks were all signed by Mrs. Lobb personally, and were offered in evidence for the purpose of showing that, during all of that period, she was personally handling her bank account.

On cross-examination, he stated that he never had any notice that Mrs. Lobb was not able to handle her own affairs. She showed herself mentally alert in all transactions which he had with her. He said that he had never been engaged in the sale of corporate stocks or in the promotion of ''any stocks or allied interests'', except in connection with a reorganization of the Railway Exchange Building. Considerable time was spent on cross-examination respecting certain ''common-law trusts'' which he had organized or had assisted in organizing. He freely admitted that he had organized such trusts for clients, and said that he had organized a great many others of a similar nature. (It appears that the trusts were enterprises of the kind sometimes described as ''Massachusetts trusts'', a form of business organization in fairly common use. We see nothing sinister in the fact that Mr. Wilson had been active in such matters.) He denied that he had ever handled any of Mrs. Lobb's property, bank accounts or money, and stated that she paid her own bills. He said that, until he arrived at Hillsboro, he did not know the purpose for which Mrs. Lobb sent for him. Mrs. Lobb told him that she wanted the $1000 bequest to Mrs. Peasley to be a specific charge upon the

California property, and he did not ask her why she desired to have it so limited.

"Q. What did she say about why she was giving you the money, or the residue of the estate? A. I don't recall that she said anything except that she felt that I had done a lot of work for her and that I ought to have something if there was anything left. * * * Q. Didn't you know that she had to have independent advice on that will as long as you were a beneficiary and her attorney? A. I don't think that occurred to me at all. Q. Why did you tell her that she had to have another attorney draw it? A. Because I wouldn't be very keen on drawing a will to myself from a client, in any event."

Mrs. Lobb asked him if he knew of anyone who would draw the will for her. He inquired "if Mr. Bristol would be all right", whereupon Mrs. Lobb herself "suggested the young man in the office,—she didn't suggest Mr. Clark's name; I don't think she remembered it". Mr. Wilson said that he did not know whether either Mr. Bristol or Mr. Clark would be willing to draw the will under the circumstances. It was an unusual request, because there was no money to pay them. Mrs. Lobb was living at Hillsboro because she was pretty poor and did not feel able to stay in town; he knew that there was no money in it for anybody, and was a little hesitant about asking anybody to do it. He thought that some friend of his would be more likely to do it than some stranger when there wasn't any money involved. He told Mr. Clark, when he asked him if he would go out there, that he doubted if there would be anything left in the estate. The property in California had theretofore been sold for taxes, and Mrs. Lobb had refused to deal with a prospective purchaser. When it was finally sold, it brought some four or five thousand dollars less than

had been originally offered. Prior to that time, he doubted if there would be anything left in the estate, as the only visible or tangible assets were ten acres of land at Woodburn, and whatever personal effects Mrs. Lobb had, plus "a little oil royalty from Oklahoma".

"Q. Why did you tell her that you thought it was a mistake? A. I told her that I thought—in fact, I didn't think there would be anything left in the estate anyway; I didn't think it was worth while making a will because I thought the California property was gone after Cochrane's deal didn't go through, to be frank with you. Then the other reason was I thought it would be better for her nephew and nieces to have whatever might be left."

He did not know of anybody more competent to give independent advice than Mr. Bristol or Mr. Clark.

Miss Hazel M. Bruns, who formerly was secretary for Mr. Wilson but is no longer in his employ, testified that she had never borrowed any money from Mrs. Lobb, and had never prepared any will for her other than the codicil. She never heard of any will under which she (Miss Bruns) was to receive $150 and the net proceeds of the California farm. She denied that Mr. Wilson was present when the codicil was signed. Mrs. Lobb told her that she wanted to revoke the bequest to Leona Peasley. Both Mr. Clark and Mr. Wilson were out of the office, but Mrs. Lobb insisted that she wished to have the matter attended to immediately and could not wait until their return. Thereupon Miss Bruns went back to the office and "got this book of forms and made it out". She did not consult either Mr. Wilson or Mr. Clark. She had been Mr. Wilson's stenographer for about twenty years. She

never observed any conduct on Mr. Wilson's part that would be calculated to control or dominate Mrs. Lobb in anything she wanted to do. Mrs. Lobb was not a person one could dominate. Miss Bruns was one of the witnesses to the will. She testified that, after the will had been signed and had been sealed in an envelope, Mrs. Lobb handed it to her and told her to put it in the safe in the office, which she did. When the codicil was executed, Mrs. Lobb asked her to put that in the safe also, and she did so. The safe was Mr. Wilson's safe, but she alone knew the combination of it, as Mr. Wilson had never learned it. Her relationship with Mrs. Lobb was friendly. On one occasion Mrs. Lobb wrote to Mr. Wilson and asked him to try to find an apartment for her. He, in turn, asked Miss Bruns to do so, and she tried, but could not find one. That was merely an accomodation to Mrs. Lobb. Her only purpose in visiting Mrs. Lobb was to accomodate her.

"There was no other purpose in it; she was an elderly lady, and a nice old lady, and she didn't seem to have very many friends, and she'd call me up and ask me to come up for this and that; and I'd go there during my lunch hour, and then I'd go back to the office; if there was anything that she wanted I was always glad to do it for her but there was no—I didn't discuss her business with her at all at any time. * * * I never borrowed a penny from her."

She never quarreled with Mrs. Lobb. She never had any thought of living with Mrs. Lobb. With reference to the execution of the will, she stated:

"Mr. Clark picked up the will and asked her if that was her intention, to carry out the terms of it, and then started in to read the will to her himself, and he read it paragraph by paragraph and asked her each time if that was her desire, and

she said it was. Q. That was before she had signed it? A. That was before she signed it."

She often called upon Mrs. Lobb—at first, not more than once a month, or once in two months, but later Mrs. Lobb was in the habit of telephoning to her, and there was a short period, when Mrs. Lobb was very ill, that Miss Bruns called on her perhaps two or three times a week. Sometimes the calls were on business matters, but sometimes she performed little personal services for Mrs. Lobb. "She was a woman, you know, that couldn't move around very readily, and I was always glad to do anything for her." So far as she knew, Mr. Wilson's dealings with Mrs. Lobb were always business affairs. She handled all of the correspondence and there was nothing in it other than in relation to business affairs. She told Mr. Wilson that the codicil had been executed.

Mr. Edward J. Clark testified that his acquaintance with Mr. Wilson commenced in 1919 or 1920. He became well acquainted with Mr. Wilson and often visited him. There was no partnership between them, but Mr. Wilson often employed him for court work "from case to case", and they divided the fees. He formed a very high opinion of Mr. Wilson's integrity and honesty, and said that his professional reputation was high.

One morning Mr. Wilson came into his office, and "said that he had been out to see this lady client at Hillsboro, and very much to his surprise, he had found that she wanted to leave him her property, except for certain bequests, and he told her he didn't want it; he said 'I'm not interested in her property, but I don't think she'll have any when she gets through; she is old, but if it will please her any, I want to help her get her will drawn, and

she has asked me to suggest somebody to her to come out to draw her will when I told her that I wouldn't draw it and couldn't draw it, because she wanted to leave her property to me, * * * I suggested the name of a couple of attorneys, and she chose you, and asked if I would have you come out,' * * * ''.

Having prepared the will in accordance with Mrs. Lobb's desires, as communicated to him by Mr. Wilson, Mr. Clark, accompanied by his wife and Miss Bruns, went to Hillsboro and called upon Mrs. Lobb. They were shown into her bedroom by Mrs. Peasley. He thinks that Mrs. Lobb requested Mrs. Peasley to leave the room. He had met Mrs. Lobb only once prior to that occasion. He went over the will with her, paragraph by paragraph. He had two things in mind: first, to determine, from his own observation, that she was capable and had testamentary capacity, and, second, being conscious that he had drawn the will on information as to her wishes which had been conveyed to him by the principal beneficiary, he felt that he should be very careful to make sure that the beneficiary had succeeded in giving him the general idea of what Mrs. Lobb wanted, and that he (Mr. Clark), in his choice of English, had expressed what she wanted. She seemed very alert for a woman of her years. Mr. Wilson was not discussed except that, when Mr. Clark read over the paragraph in which it was stated that Mr. Wilson had shown Mrs. Lobb many kindnesses, and that she felt that she was under no obligation to her relatives, Mrs. Lobb said

"that was absolutely the fact, that Fred had been a very good friend to her, and had shown her many kindnesses and courtesies, and that she felt that her kin had no charge on her; in other words, as I remember, she interrupted the continuing of

the reading of the next paragraph to repeat in substance, what I had said in the will in her own way.''

On cross-examination, Mr. Clark testified that Mr. Wilson was not his law associate; they merely officed together. At that time he had no pending business with Mr. Wilson. He was busy upon his own practice.

'' * * * Q. You were aware, then, of the duty and responsibility which you had, presumably as Mrs. Lobb's attorney, in talking to her because of the fact that Mr. Wilson was in your office? A. Yes, as I said yesterday, I had two principal thoughts in mind: first, I was going to determine from my own observation, to my own satisfaction, whether the woman was thoroughly competent, knew what she was doing; then I was going to do something that I would not have done had I gotten the information from her first: I was going to read the will to her paragraph by paragraph and make sure that she understood and approved each choice of each provision of the language used. Q. Why were you so careful to see whether or not 'she was mentally competent? A. For no reason except that I had met her only once before that, and I say again, any person that I draw a will for, especially if they are long in years, I naturally want to know, so that if I am later called to the stand, I can say with conviction that they have mental capacity, and if I thought they did not have mental capacity, I would not proceed with the execution of the will. * * * A. I read the will to her paragraph by paragraph. I listened to her conversation first about general subjects, let her go on for some little time. She showed that she had a ready, alert memory, seemed to be in no distress or pain, as far as I could see and talked rationally and capably, and took her own time in reading the thing over after she had gotten her glasses. Then I went over it. Now, had she expressed any dissatisfaction at any point, the will would either have been redrafted to meet her wishes,

or if she had said 'That is not my wish', it would either have been made to her wishes, or it would not have been executed, of course. Q. What did you do? What did you advise her in? A. She asked no advice. Q. I'm asking you, Mr. Clark, did you advise her any? A. What do you mean? Advise her as to what? Ask me what I should have advised her. Q. Did you give her any legal advice as to her will? A. I gave her none. I didn't argue with her, if that is what you mean. Q. I didn't ask you whether you argued with her: I asked you whether you gave her any advice? A. I don't know what advice I was called on to give her. * * * Q. * * * in view of the fact that you were in with Mr. Wilson, what did you do to attempt to offset or to satisfy yourself that there was no undue influence being exercised by Mr. Wilson? A. Well, I would have to say first that I didn't know that there was any relationship of attorney and client existing between them, other than just the friendliness and the courtesies that he had shown her. Now, so far as I knew, the will expressed her appreciation, her reaction to his kindnesses throughout the years, and I might say that it was his courtesy in everything that I saw between them on the two occasions I saw them together, once before the will was drawn and once after when she was in the office, and I saw nothing different between Fred's courtesy to her in those times and the courtesy that he habitually shows to every person that comes in there.

* * * * * * *

"Q. Now, why didn't you go out to Mrs. Lobb's and ask her first what she wanted before drawing up a will based upon Wilson's statement, and then taking that out to her and having her sign it? A. I had no expectation of any—making any change, and I told him that if I made one trip out there—I was doing it for nothing—and another thing, I didn't suppose that there was any substantial estate involved, but I certainly didn't want to make two trips

out, so we took it on a Saturday morning,—I always quit at noon anyway, and we went out there—.

 * * * * * * *

"A. * * * I thought that I was doing an accommodation job for Mrs. Lobb, prompted thereto by the fact, as I have narrated, by her financial condition, and prompted thereto also by the fact that she felt so kindly toward Fred, and that as he would not make her a charge, I would not either,—just a matter of doing a kindness to an old lady."

Mrs. Leona Peasley testified that she was a practical nurse. She had known Mrs. Lobb for about eight years and visited her from time to time. Mrs. Lobb was quarrelsome, and Mrs. Peasley believed that she felt that "people didn't always treat her right". At the time when the will was executed, Mrs. Lobb was living with Mrs. Peasley at Hillsboro. Mrs. Lobb told her that she had not made a will and wanted to make one. There was no telephone in the house and Mrs. Peasley's father, at Mrs. Lobb's request, telephoned to Mr. Wilson from a nearby house. When Mr. Clark and his party arrived at Hillsboro, Mrs. Peasley showed them into Mrs. Lobb's room. It was morning and Mrs. Lobb had not yet arisen. Mrs. Peasley then left the room at Mrs. Lobb's request. She knew that they were "making a will" and could hear Mr. Clark reading it. She heard her own name mentioned. After a little while, Mrs. Lobb came into the dining-room and told Mrs. Peasley that she would never be sorry for taking good care of her, that she had remembered her, but she didn't tell her anything else about the will. Mrs. Lobb often told Mrs. Peasley that her relatives were not to have a dime. She always spoke of Mr. Wilson as her only true friend.

"Mrs. Lobb was a woman with a dual personality, and it seemed as though, when people were

with her, she was one way, and when she was away from you, she was another way, but Mr. Wilson, it seems is the only one that she never talked about. * * * Well, she said that he was her true friend, and that he had always treated her right. It seemed as though she thought everyone else was after her money.''

Mrs. Lobb had a picture of Mr. Wilson on her desk, and always spoke highly of him. He never came except when Mrs. Lobb called him. Miss Bruns called, she believed, every day or every other day during a period of about six months, down to June, 1940, while Mrs. Lobb was living at the Ongford Apartments, where Mrs. Peasley served her as a practical nurse. Miss Fouse also called frequently. In August and September, 1940, Mrs. Peasley visited Mrs. Lobb occasionally. On one occasion Mrs. Lobb told her that she had had trouble with Miss Bruns, and had turned over everything to Mr. Wilson to take care of for her—the things that Miss Bruns had been doing, such as depositing her checks, and so forth. She said that Miss Bruns had tried to borrow money from her, which made her angry.

On cross-examination, she said that Mrs. Lobb used to get mad over little things and would often scold. Mr. Wilson was about the only person whom she had never heard Mrs. Lobb get angry with or about. ''She did make a remark to me at one time that if she was twenty or thirty years younger she would marry Mr. Wilson.'' She never mentioned anything about his having kissed her. Mrs. Peasley was acquainted with Mrs. Lobb for three or four years before the will was executed. She accompanied Mrs. Lobb to Mr. Wilson's office a couple of times. She talked of Mr. Wilson frequently, as her attorney. Mrs. Peasley worked for Mrs. Lobb on three different occasions. She saw Mr. Wilson

in the apartment only once. She heard nothing said between them to indicate that they were more than just friends, or that he was trying to influence her.

Miss Marian Fouse, a witness for contestants in the former hearing, was called as proponent's witness. Her attention was called to a statement contained in a letter which she wrote to Miss Anna Lyons, one of the contestants, after Mrs. Lobb's death, as follows:

" * * * it makes my blood boil to think of that smooth Wilson hoodwinking your aunt in such a way".

Being asked to explain this statement, she testified:

"All right. I base my statement there upon my observations of Mr. Wilson's actions toward Mrs. Lobb over the period of time that I had known her, and the actions which, in my opinion, were not those of a lawyer—pardon me—toward his client, but were more personal. * * * I observed, and I had occasion to observe that frequently. There were gifts of flowers, of wine, on the different anniversaries that I have spoken of before; there were frequent visits to her house, and reports of the conversations that I received the next day were also such that led to—confirmed my impression that there was more than just the relationship of lawyer and client. * * * The Court: She just said gifts of wine and gifts of flowers and frequent visits, isn't that right? A. Yes. * * * there were occasions that, as I said before, he asked her permission to kiss her and received it. He also offered her a fur coat of quite a value; she told me it was mink, I believe,—offered her the use of that; and there were—in particular on one occasion he sent her quite a flowery letter; It was at Christmastime, and she asked me to read it, because she said she couldn't understand it; and so—all those things led me—or confirmed my opinion as to the relationship between the lawyer and client not being actually—

I wasn't that young and ignorant— * * * I believe he played upon her loneliness.''

On cross-examination, she said that, on one occasion, Mrs. Lobb wanted to buy a house on Northup street, but discussed it with Wilson, and he advised her against it. Mrs. Lobb was always very excited when Mr. Wilson was coming to visit her. Miss Fouse had to prepare her, get the apartment ready, and so forth. Mrs. Lobb enjoyed his visits very much and always would tell Miss Fouse about them the next day. She always spoke very favorably of Miss Lyons. She had ''raised the child,—raised her when she was a girl, and she always was very interested in what she was doing.'' She sent Miss Lyons gifts frequently. She intended to make a home for Miss Lyons, if she would come out here. She never heard Mrs. Lobb say that she had been mistreated by Miss Lyons.

The trial judge subjected Miss Fouse to an extensive and searching examination, which required her to go into minute detail respecting her dealings with and her observation of Mrs. Lobb during the period from 1936, when they first met, until Mrs. Lobb's death in January, 1942. In our former opinion, we commented at some length respecting Miss Fouse's testimony at the original hearing. Her testimony as a witness for proponent was largely repetitive of, although perhaps more detailed than, her former testimony. The court's examination was evidently intended to bring out the fact that her testimony was based principally upon what Mrs. Lobb had told her respecting Mr. Wilson's conduct, and only in lesser degree upon her own observation.

Mr. W. C. Bristol, attorney for proponent, testified respecting certain litigation and other matters in which, during the period in which Mr. Wilson was alleged to

have acted as attorney for Mrs. Lobb, he (Mr. Bristol) had acted as her sole attorney. Other attorneys, whom he named, had also acted for her from time to time. He said that Mrs. Lobb managed her own affairs, and was, in his opinion, competent to do so. He had been well acquainted with Mr. Wilson for many years, and said that he was a man of his word and of high ethical standards. Similar testimony respecting Mr. Wilson's character was given by Mr. Stephen C. M. Appleby, a banker, who had been acquainted with him since the summer of 1919.

Additional evidence on the part of contestants was given, as follows: Miss Jessie L. Peirson, a graduate nurse who has practiced her profession since November, 1923, testified that she helped care for Mrs. Lobb after the latter had been injured in an accident in the Carlton Hotel. She stated that, during her illness, Mrs. Lobb talked of her niece Anna Lyons, who resided in Washington, D. C., and said that she wanted to go east to be near her. The witness intended making a trip to New York on business, and offered to make arrangements whereby Mrs. Lobb could accompany her. Mrs. Lobb told her, however, that Mr. Wilson advised her not to go. Miss Peirson continued her acquaintanceship with Mrs. Lobb from 1938 until the latter's death. She said that Mrs. Lobb lived a great deal in the past, that she was easily pleased and displeased, that little attentions pleased her greatly, and that she would become quite angry about little things. She talked quite a lot about Mr. Wilson. He sent her flowers on various occasions, with his card, which Mrs. Lobb showed her. Mrs. Lobb told her that she had written to Anna Lyons, telling her that she needed money and, on one occasion, Miss Peirson saw a check for $50, which Anna Lyons had

sent Mrs. Lobb. She told Miss Peirson that, at his request, she had loaned Mr. Wilson $60. Miss Peirson was, at one time, interested in Mrs. Lobb's Woodburn property and offered her $1500 for it, but later Mrs. Lobb told her that Mr. Wilson was not willing for her to sell it. Mrs. Lobb was very fond of Anna Lyons, more fond of her than she was of any of her other relatives. Mrs. Lobb told Miss Peirson about Mr. Wilson wanting to kiss her.

Mrs. Mary Bagley, a dressmaker, testified that she had known Mrs. Lobb for twenty-five or thirty years, and had been associated with her to a considerable extent during the last six years of her life. Mrs. Lobb "was rather changeable and susceptible". Anna Lyons was her favorite niece. She often heard her speak kindly of Miss Lyons, and she received letters, money, and gifts from her. In April, 1939, just after Mrs. Lobb's accident in the Carlton Hotel, Mrs. Bagley was present on an occasion when Mr. Wilson made memoranda of Mrs. Lobb's wishes in reference to the preparation of a will for her. Next day Mrs. Lobb told her that Mr. Wilson would not let her sign that will.

In rebuttal, Mr. Wilson denied ever asking Mrs. Lobb for a loan at any time, and denied ever receiving any loan from her. He denied ever advising Mrs. Lobb against making a trip east with Miss Peirson. He denied having, in the presence of Mrs. Bagley, received instructions from Mrs. Lobb relative to preparing a will for her, and stated that no such incident ever took place.

■ We think there is no question but that a fiduciary relationship existed between Mrs. Lobb and Mr. Wilson. The latter tacitly admitted such relationship, and, while an elaborate attempt was made to show that Mrs.

Lobb, from time to time, and even at the time when the will was executed, had other attorneys, the fact that Mr. Wilson was one of her attorneys cannot be gainsaid. He conducted numerous negotiations and performed various services for her, such as are usually performed by attorneys, and, in at least one lawsuit, his name appeared, along with Mr. Bristol's, as one of her attorneys. Whether or not he made a charge for his services is immaterial. 5 Am. Jur., Attorneys at Law, section 31; *Packard v. Delfel,* 9 Wash. 562, 38 P. 208; *Pyeatt v. Estus,* 72 Okla. 160, 179 P. 42, 4 A. L. R. 1570. In any event, he was her confidential agent, upon whom she placed implicit reliance. Moreover, her declarations, both oral and written, and his own actions, throughout the period of their relationship, indicate that she regarded him as an intimate and trusted friend, without whose friendship, to use her own expression, "life would not be worth living".

■■ The evidence shows abundantly, as we think, that Mrs. Lobb was very susceptible to Mr. Wilson's influence. She habitually made somewhat of a parade of her warm friendship for him, and the excitement which this eighty-eight-year old lady, lame and half blind, showed in making preparation for his visits, and the eagerness with which she recounted his conversations with her, must have been rather pitiful to observe. He sent her flowers and small gifts on occasion, and she responded in kind. She boasted that he offered her a mink coat, and that he kissed her. She said that if she were twenty or thirty years younger, she would marry him. Even assuming that these things had their existence only in the lady's imagination, evidence of her declarations was properly received, not to establish the issue of undue influence, but to show that the state of

her mind was such, at the time when the will was executed, as to make her susceptible to improper influence. *Wayne v. Huber*, 134 Or. 464, 503, 291 P. 356, 294 P. 590, 79 A. L. R. 1427. Incidentally, the fact (if it be a fact) that Mr. Wilson charged Mrs. Lobb nothing for his services, while stoutly maintaining upon the witness-stand that his contacts and communications with her were business ones only, is in itself some evidence, either upon the question of undue influence or by way of self-impeachment. For indeed, it would be an unlawyerlike proceeding to make no charge against a client who had the ability to pay; lawyers, like other folk, have their living to make!

██ This court has held that undue influence, to be sufficient to cause a will to be set aside, must have been such as to have overcome the free volition or conscious judgment of the testator, and to have become the efficient cause without which the will would not have been made. *Holman's Will*, 42 Or. 345, 70 P. 908; *In re Diggins' Estate*, 76 Or. 341, 149 P. 73. The fact that a confidential relationship existed between testator and beneficiary is not, in itself, sufficient to vitiate a will in the absence of evidence indicating that the beneficiary exercised undue influence. *In re Turner's Will*, 51 Or. 1, 93 P. 461. However, where a confidential relationship is shown to have existed, and the will is inconsistent with the claims of duty and affection, slight evidence that the beneficiary abused the testator's confidence is sufficient to invalidate it. *In re De Haas' Will*, 135 Or. 392, 296 P. 42.

█ Mrs. Lobb's relations with her nieces and nephew, the contestants here, were friendly. This was true in a marked degree of her relationship with her niece Anna Lyons, with whom, through the years, she main-

tained a cordial correspondence. On one occasion, when Mrs. Lobb was in need of funds, Miss Lyons sent her fifty dollars. They frequently exchanged gifts. Some letters which Mrs. Lobb wrote to Miss Lyons, one of which was dated December 17, 1941, (only about a month before she died) were offered in evidence by contestants in the first hearing, were rejected, and were received under the rule. We think that they should have been admitted in evidence, as their tenor tended to show the cordiality of the relationship between aunt and niece. One of the letters, dated July 14, 1939, tends to corroborate the fact that Miss Lyons either loaned or gave Mrs. Lobb money. (''Thanks very much for the favor. It was a real necessity or I would not have asked for it.'') In another, dated April 23, 1940, Mrs. Lobb said, in part:

> '' * * * remember me in your 'Ave Marias' and I will pray that you will have every kindness and care when you reach my stage! I know you will because you have been so thoughtful of others less fortunate than yourself, those things don't go unrewarded. * * * ''

In another, dated December 17, 1941, she says:

> '' * * * Why don't you retire and come out here and live with me. I have plenty of room for a partner and there would be only one rent to pay, and I have 10 acres a few miles from here where we could put up a little home and be farmers. * * * ''

Incidentally, the letters showed that a warm friendship existed between Mrs. Lobb and Marian Fouse, and that the latter had done many acts of kindness for the former, which were fully appreciated. We mention this fact, for the reason that we suspect that the trial judge's decision herein may have been based, to a considerable extent, upon his own examination of Miss

Fouse, which was protracted and rather severe. From a letter dated September 8, 1941, we quote:

> " * * * Marion has a job on KGW broadcasting Co. eleven hours a week, is paid 27.50 per wk. also on the winter symphony one night per wk. but she still finds time to see me every day. She is a very wonderful young lady, she has poise, dignity, she can meet anyone! She is not boy crazy, nor clothes crazy. * * * "

 Where a principal beneficiary under a will sustains a confidential or fiduciary relationship toward the testator, and actively participates in the preparation of the will, he must assume, when the will is attacked upon the ground of undue influence, the burden of proving that he did not exert such influence. *In re Rupert's Estate,* 152 Or. 649, 54 P. (2d) 274; *In re Knutson's Will,* 149 Or. 467, 41 P. (2d) 793. This rule obtains with especial force in cases where the beneficiary is the testator's attorney. In such a case, this court, in reversing a nisi prius decision by the present writer, characterized the resulting presumption as a "strong presumption of undue influence created by law to protect those who are dependent upon others in transactions of this character." *In re Brown's Estate,* 165 Or. 575, 108 P. (2d) 775. In our former opinion in the case at bar, we said, in effect, that the dictation of the will by Mr. Clark was a mere formality, and that the inference of undue influence would have been no different if Wilson had himself dictated it. The additional evidence, in our opinion, has not improved Mr. Wilson's situation in any material respect. Mr. Clark, whom he called in to draw the will, could not be regarded as an independent adviser. He shared a suite of offices with Mr. Wilson, and handled a considerable portion, if not all, of his court work.

When Mrs. Lobb told Mr. Wilson that she desired him to draft her will, and that she wished to make him the beneficiary of a substantial portion of her estate, his situation, as her attorney and intimate friend, should have prompted him to insist upon her procuring independent advice. *In re Rupert's Estate,* supra; *In re Brown's Estate,* supra. By "independent advice", we do not mean necessarily the advice of a lawyer. The necessities of the situation would have been satisfied if the testator, before executing the will, had had the privilege of conferring fully and confidentially with a disinterested and competent person who was disassociated from the interests of the proposed beneficiary. (See *Post v. Hagan,* 71 N. J. Eq. 234, 65 A. 1026, 124 Am. St. Rep. 997.) We imply no criticism of Mr. Clark's professional character or conduct. He was not, however, disinterested in the sense in which that word should be construed for the purposes of this case, and his own testimony shows that he considered that he had fulfilled his duty when he had satisfied himself that Mrs. Lobb was mentally competent and knew the contents of the will. This was not enough to constitute "independent advice". *In re Kuhn's Will,* 120 Kan. 13, 241 P. 1087. Mr. Clark, in fact, was not an independent adviser; he undertook the business of drawing the will and of traveling to Hillsboro to have it executed chiefly as a good-natured gesture of friendship toward Mr. Wilson. His friendship and admiration for Wilson neutralized him in advance.

■ From very ancient times, bequests to the draughtsman of a will have been reprehended by law. By the Roman law, they were invalid. Page on Wills, (Lifetime Ed.) section 829; Justinian, Digest, Book XLVIII, Tit. 10, 15. When a will is drawn by a beneficiary who is in confidential relations with the testator,

a presumption of undue influence arises. Page, op. cit., section 829; *Greenwood v. Cline,* 7 Or. 17; *In re Rupert's Estate,* supra; *In re Brown's Estate,* supra. Such presumption, in the case at bar, was not, in our opinion, overcome by proponent's evidence.

Mrs. Lobb's estate was appraised at $7028.72. It will be remembered that the will contained a bequest of $1000 to Leona Peasley, which was made a charge upon the testator's California property. That property, when the will was executed, had been sold for unpaid taxes. Subsequently, it was redeemed from the tax sale, and thereafter, by codicil, the bequest to Mrs. Peasley was revoked. The codicil was drawn by Mr. Wilson's secretary. It was shown to Mr. Wilson, for his approval as to form, before it was executed. Although it was drawn by his own employee, and its effect was to make him sole beneficiary of Mrs. Lobb's estate, Mr. Wilson once again, as when the will was drawn, failed to observe the amenities of the situation. He says that he did nothing beyond approving the form, but what he should have done was to have taken affirmative steps to eliminate both his employee and himself from a situation in which his personal interests conflicted with his fiduciary obligations.

Mr. Justice HARRIS, in *Kirchoff v. Bernstein,* 92 Or. 378, 387, 181 P. 746, said:

"The rules which define the duties of an attorney when dealing with his client are well established. The relation between an attorney and client has always been treated as one of special trust and confidence; and for that reason the law requires that the conduct of an attorney, when dealing with his client, shall be characterized by fairness, honesty and good faith. Indeed, so strict is the injunction not to take advantage of the client, that when a

client challenges the fairness of a contract made with his attorney the latter has the burden of showing not only that he used no undue influence, but also that he gave to his client all the information and advice which it would have been his duty to give if he himself had not been interested, and that the transaction was as beneficial to the client as it would have been if the latter had dealt with a stranger. * * * ''

The following comments upon the foregoing from a dissenting opinion by Mr. Justice BENNETT, are peculiarly applicable to the present case:

''These are brave, strong words, and with every syllable of them I entirely concur. They fix the duty of an attorney toward his client at a high standard—but not too high, when we consider the peculiarly confidential relation which an attorney enjoys; and the fact, that those with whom he deals, are oftentimes helpless from infancy or old age, and are generally ignorant of the law, and of their legal rights; and practically at the mercy of the lawyer who represents them. Such a declaration of the principles which govern attorneys, will be an inspiration to the lawyer who cares deeply for his profession and for its honor.

''When it becomes generally known, that this is the standard which governs the conduct of attorneys—and that the courts unflinchingly carry the principles so declared into execution—there will be an end of that unjust belief, unfortunately now so general among laymen, that lawyers are mercenary and unscrupulous grafters; and that the courts, being composed of lawyers promoted, look with complacent tolerance, and winking eye, upon the unjust greed and rapacity of their erstwhile associates.''

■ We are not required to pass judgment upon Mr. Wilson. We lay no claim to omniscience, and it may be that his motives and his actions in the premises were

beyond reproach. Basing our decision upon the narrow ground that he failed satisfactorily to repel the inference of undue influence which the circumstances raised against him, we hold that the will should be set aside.

Appellants seek to have us pass upon the propriety of certain disbursements, by way of attorney's fees and executor's commissions, which, they say, the executor, Mr. Wilson, in his administration of the estate, has made without authority. These matters are not properly before us on this appeal, except so far, if at all, as they are included in the decree appealed from. Their allowance or disallowance must, in the first instance, be determined by the probate court. Provided an executor acts in good faith, the court has discretion to allow him, whether successful or not, the reasonable expenses incurred in his defense of a will. *In re Shepherd's Estate,* 152 Or. 15, 42, 49 P. (2d) 448; *In re Carlson's Estate,* 156 Or. 597, 68 P. (2d) 119. It is deemed proper to state, however, that the setting aside of a will, because of undue influence exerted over the testator by the executor-beneficiary, implies a holding of lack of good faith on the executor's part. Moreover, the executor having been the sole beneficiary under the will and codicil, in this instance, in seeking to sustain them, he was subserving his personal interests alone. The successful contestants ought not to be charged with his expenses in that regard. *In re Carlson's Estate,* supra.

In this court, upon this second appeal of the cause, the proponent, for the first time, demurs to the contestants' petition in objection to probate, on the ground that such petition does not state facts sufficient to constitute a cause of contest. The petition alleges, in effect, that the purported will and codicil are not and

never were the will and codicil thereto of Josephine M. Lobb, deceased, because, at the respective times of the execution thereof, the respondent S. F. Wilson, by the use of undue influence, dominance and control of said decedent, caused her to execute the same; that said instruments did not contain the desires and wishes of said decedent, but in fact said Wilson substituted his will therefor; that, at said times and for some time prior thereto, Wilson was acting as the attorney for said decedent and, by reason of his fiduciary relationship, exercised domination and control over her, and caused her to execute said instruments while under his influence and control. While perhaps subject to the technical objection that it states conclusions of the pleader, at this stage of the proceedings every reasonable inference should be invoked in favor of the pleading. The gist of the statement of contest was the exertion of undue influence by Mr. Wilson over Mrs. Lobb, while he sustained toward her a fiduciary relationship, and the execution by her, as the result of such undue influence, of a will and codicil which expressed not her will, but his. In the absence of a timely motion to make more definite and certain, we think that the allegations were ''sufficiently broad to question the validity of the will'', on the grounds stated. *Simpson v. Durbin,* 68 Or. 518, 136 P. 347; *Mendenhall's Will,* 43 Or. 542, 547, 72 P. 318, 73 P. 1033; 41 Am. Jur., Pleading, section 407. The demurrer is overruled.

The decree of the probate court is reversed. The instruments, heretofore admitted to probate as and for the last will and testament of Josephine M. Lobb, deceased, and codicil thereto, are set aside, annulled, and held for naught. Contestants are allowed their costs and disbursements in this court and in the lower court.