142 N.J. Super. 56 (1975)
360 A.2d 400
IN THE MATTER OF THE ESTATE OF JENNY OLGA LEHNER, DECEASED.
Superior Court of New Jersey, Appellate Division.
Argued March 17, 1975.
Decided August 25, 1975.
*57 Before Judges MICHELS, MORGAN and MILMED.
Messrs, Harold L. Jacobs and Gary D. Barton argued the cause for the contestants-appellants.
Mr. Michael A. Gallo argued the cause for the respondent, William P. Sheridan, Esq. (Messrs. Gallo and Geffner, attorneys).
*58 The opinion of the Court was delivered by MILMED, J.A.D.
This is a will contest. The decedent, Jenny Olga Lehner, died on April 20, 1972. She was in her 80's. An instrument purporting to be her last will, dated November 18, 1969, was admitted to probate in common form by the Surrogate of Bergen County on May 4, 1972 on the complaint of William P. Sheridan, the sole beneficiary and executor named therein. Sheridan, an attorney with an office in Hackensack, is referred to in the will as decedent's "friend and attorney."[1] At the time of her death decedent was a widow, her husband having died in 1964. She had no children. She was survived by three sisters and one brother. The three sisters are Mildred Berndt, Minnie Berghaus and Wally Lehner, residents of New Jersey. Her brother was Alfred Jahn, a resident of the State of Washington. He died three weeks after decedent. His widow, Wally Jahn, is the executrix of his last will and testament.
By order to show cause under R. 4:80-7(a), dated October 3, 1972, decedent's three sisters and sister-in-law (Wally Jahn) instituted this contest seeking to set aside the judgment of the surrogate admitting the will to probate. The charge is that the will was the product of undue influence exerted by Sheridan upon testatrix. Following a de novo hearing in the County Court, the trial judge found that no undue influence had been exercised by Sheridan upon decedent and that the contestants "have not been aggrieved and therefore have no standing to maintain this action." He ordered the entry of judgment dismissing the proceeding and affirming the action of the Surrogate of Bergen County in admitting the will to probate, and awarded a counsel fee to the attorney for the contestants in the amount of $1,500. *59 The contestants appeal. Respondent, the proponent William P. Sheridan, cross-appeals from the award of the counsel fee.
The essential facts may be summarized as follows: The decedent was a very heavy woman, lame from birth and of failing memory. She sold her home in Hackensack in May 1969, placed her furniture in storage and went to Arizona. She returned shortly thereafter and purchased a house in River Edge. There are numerous references in the record to her inability to manage her own finances. William P. Sheridan was admitted to the Bar of this State in 1949. Prior to that time he was a vice-president and trust officer of Peoples Trust Company in Bergen County. He was not related to decedent. He first met her in November 1966 when he drew a will for her. In that will decedent made a specific bequest of $4,000 each to her friends, Ilse Hirschle and Peter Hirschle, of West Germany,[2] and left her residuary estate to the New Jersey Association for Retarded Children, Bergen-Passaic Unit, Inc., located in Hackensack. The executor named in that will was Peoples Trust Company of Bergen County. Sheridan, who drew the will, was one of the witnesses to its execution. No mention is made in that will of decedent's sisters and brother. At the time, decedent told Sheridan that she owned the home in which she lived "and she had some savings bonds and some savings accounts. A total value roughly of $100,000." In January 1967 she wanted to change her will. Sheridan drew a new will in which she named as her sole beneficiary the New Jersey Association for Retarded Children, Bergen-Passaic Unit, Inc., and again named Peoples Trust Company of Bergen County as executor. Sheridan was also one of the witnesses to the execution of this will. No mention *60 of her sisters and brother is made in this will. In April 1967 another will of the decedent was drawn by Sheridan. In that will she named Sheridan as executor (and trustee of the trusts created thereunder) and directed him, after payment of taxes, funeral and administration expenses, to liquidate the remainder of her estate, the proceeds thereof to be paid in three equal parts: one part to a "friend" in Phoenix, Arizona;[3] a second part to two "friends" in West Germany, in equal shares;[4] and the third part to her "friends", Ilse Hirschle and Peter Hirschle, of West Germany, in equal shares.[5] Sheridan was also one of the witnesses to the execution of that will. No mention of decedent's sisters and brother is made in this will. In addition to drafting these three wills Sheridan performed other legal services for decedent, i.e., he represented her on the sale of her house in Hackensack, in concluding the administration of her husband's estate, and in filing her claim for a senior citizen's exemption in regard to her home in River Edge. He also assisted her with "her tax problems and problems involving her checking account." In regard to the latter he wrote checks for her. On October 15, 1971 decedent gave him for safekeeping her bank checkbooks and passbooks and also "a blank signed withdrawal on one of the passbooks." Sheridan testified that "She didn't want to have possession of these assets any longer for fear that others would take advantage of her." She indicated to Sheridan that she had "reluctantly and unwillingly" signed two checks for a couple who had been performing services for her around the house. Sheridan also testified that he visited decedent socially "only once," which "was just before Christmas of 1971, where I gave her for Christmas *61 either a fruit basket or a box of candy. I don't remember that."
In the latter part of 1969 decedent told Sheridan that she wanted to have a new will drawn including him as a beneficiary. He told her, "I wouldn't draw such a will and couldn't draw such a will and didn't want her to name me as a beneficiary." He said that she told him that she "wanted to name" him in her will; that she "understood why" he "would not draw such a will" and that he "was not the only attorney she knew; she named three other attorneys * * * Mr. Butler, and Clinton and Bentley who were partners." We note at this point that John F. Butler, the attorney who ultimately drew the will which is in contest, testified that he did not know decedent prior to the Fall of 1969 when she asked him to draw her will. Butler, an attorney with an office in Hackensack, testified concerning an incident that occurred in September or October 1969 while he was having lunch in Phiefers Restaurant in Hackensack "at the table where many of the attorneys gather about." He said that
Mr. Sheridan had lunch there quite frequently and this one particular lunchtime he said to me; he said, "Now, a woman by the name of Jenny Lehner may possibly get in touch with you to draw her will. He said [sic] she wants to remember me in her will and I have told her that under these circumstances I can't draw the will and she has the name of two or three attorneys including yourself, and she may conceivably call you."
Butler also stated that Sheridan indicated to him that the decedent "probably would want to leave everything to him." About ten days or two weeks later Butler received a call from a woman identifying herself as Jenny Lehner; she told Butler that she wanted him to draw her will, and he told her that he could stop at her house some afternoon on his way home from the office and go over the matter with her. In early November he stopped off at her house. She told him that she wanted him to draw her will and "to set it *62 up in such a fashion that everything would go to her friend Mr. Sheridan." He inquired about her relatives and she told him of her brother and sisters, saying, in effect, "I'm not close to them. They are not close to me and we don't bother with each other at all * * * I have no feeling for them." On this first occasion Butler was in decedent's home for about three-quarters of an hour because decedent "insisted" on showing him through the house. He did not discuss with her the extent of her estate. In this regard he testified that "She said she owned the house, she owned the house, but I did not inquire as to her assets and she didn't volunteer as to exactly what she had." While he made notes of his conversation with decedent, the notes contained no reference to who the beneficiary was to be. He testified that there was no particular reason for this since "there was no question in his mind that he [Sheridan] was to be the sole beneficiary." Thereafter Butler drew the will, and he and his secretary then went to the decedent's home to have the will executed. Butler stated that he "went over the will with her carefully" and that she stated to him that "this is exactly what she wanted to do." He stated that decedent had read the will before signing it; that he and his secretary witnessed its execution; that the decedent "took the will" and that he gave her his "bill." He stated that sometime thereafter he was having lunch in Phiefers and "I don't know whether Mr. Sheridan brought it up and asked me if Mrs. Lehner had had her will drawn and whether I said Mrs. Lehner has had her will drawn." He stated that he had known Sheridan from about 1950; that he knew him when he [Sheridan] was a trust officer in the Peoples Trust Company; that he never had any dealings with him or handled any matters for him; that he knew him by name and saw him in Phiefers Restaurant occasionally for lunch with other attorneys.
Sheridan testified that on November 24, 1969 decedent showed him the will and asked him to take possession of it, *63 which he did; that she asked him to return it to her in January 1970, and that he did give it back to her at that time; that on October 15, 1971 she again turned it over to him along with her bankbooks and passbooks and the "blank signed withdrawal on one of the passbooks"; that she asked him "to keep all that material in safe keeping," and that he retained the will until her death.
Mrs. Elinor Merweedy testified that from the time that decedent bought a home in River Edge in 1969 until Christmas of 1971 she visited the decedent about once a week; that she "did her grocery shopping," did errands for her and paid bills; that in the Fall of 1970 decedent told her that she was going to have her will redrawn and leave her "a couple of diamond rings"; that decedent told her, "I'm going to leave these to you and she said she was going to have other wills drawn up and she said that Mr. Sheridan couldn't do it because he was going to be in her will and he was going to have a friend do it."
It is apparent from the testimony of Mrs. Merweedy and the testimony of decedent's sister Wally Lehner that decedent fantasized that Sheridan was going to take her out socially, to lunch or to dinner or to his summer place, and that decedent was very fond of Sheridan. Decedent's sister Wally Lehner stated that decedent had told her that she (decedent) had given Sheridan a thousand dollars for repairs to his summer home; that decedent's love for him "was almost pathetic. Her love, she loved him. He kissed her and then he flew out the door, she said," and that on one occasion decedent bought a coat, a dress and three wigs "especially so she would have something to wear in case Mr. Sheridan would take her out for dinner."
Counsel for respondent objected to a line of questioning seeking to elicit from Wally Lehner what decedent had told her regarding Sheridan's "actions towards her." The trial judge sustained the objection stating, "bear in mind you are now talking about a reputable lawyer in the *64 State of New Jersey. I do not intend to allow this record to be cluttered up with hearsay which is slanderous."[6]
It is clear from the testimony of decedent's three sisters that decedent was not in good health; that she was forgetful; that there was no animosity between her and any of her sisters, and that the relationships between them were friendly. Wally Lehner testified that for about the first year and a half after decedent moved to River Edge she visited her "every weekend to help her"; that when she got there she "put everything in its place"; that she "brought her cooked meals many times," and that she called her "practically every day."
There was also testimony that decedent understood what she was doing when she sold her house in Hackensack in May 1969; when she bought her house in River Edge in September 1969, and when she signed a waiver of administration in regard to her deceased husband's estate in April 1970.
The contestants, as next of kin of decedent, those who would take an interest in the event of intestacy, N.J.S.A. 3A:4-4, were persons "aggrieved by the judgment" of the Bergen County Surrogate's Court admitting the November 18, 1969 will to probate. R. 4:80-7(a). They, accordingly, did have sufficient interest and standing to proceed in the County Court seeking to set aside that judgment.[7] The trial judge was in error in holding otherwise. As stated by the court in In re Lent, 142 N.J. Eq. 21 (E. & A. 1948):
*65 It seems clear that in a case of this kind, involving the validity of a will, the next of kin, those who would take an interest in the event of intestacy, do have a standing to attack any and all wills of a decedent. [at 22]
The court in Lent recognized that an earlier (1927) will might also be contested and noted the suggestion of the next of kin (appellants) that they be given an opportunity of presenting evidence attacking the validity of that instrument. The court held, however, that the 1927 will could not have been attacked in the proceeding then pending since that instrument had not been offered for probate, and
* * * the parties in interest, the beneficiaries and the executor, are not in court and could not be bound by a decree against their interests in a proceeding to which they were not parties. Therefore, it would seem that the only course which the appellants could pursue was to make their attack upon the will offered and if successful then make a further attack upon the earlier will when it was offered, as it would have to be. [142 N.J. Eq. at 23]
Cf. In re Hand's Will, 95 N.J. Super. 182 (App. Div. 1967), certif. den. 50 N.J. 286 (1967), where this court pointed out (at 188) that in that case "those interested in the respective wills are identical and all parties are before the court."[8]
The trial judge also erred in failing to give effect to the presumption of undue influence which was raised in the circumstances of the case. As pointed out in 5 N.J. Practice (Clapp, Wills and Administration) (3d ed. 1962), § 62 at 145:
If a will benefits one who stands in a confidential relationship with the testator and there are in addition circumstances of a suspicious *66 character, then a presumption of undue influence is raised and the burden of going forward with the proof is shifted to the proponent. A confidential relationship arises where a confidence is reposed by reason of the testator's weakness or dependence; or where the parties occupy relations in which reliance is naturally inspired or in fact exists, as, the relation between * * * client and attorney * * * *.
See also, In re Blake's Will, 21 N.J. 50, 66 (1956); In re Rittenhouse's Will, 19 N.J. 376, 378-379 (1955); In re Davis' Will, 14 N.J. 166 (1953); In re Hopper's Estate, 9 N.J. 280 (1952); Gellert v. Livingston, 5 N.J. 65 (1950); Annotation, "Wills: Undue Influence In Gift To Testator's Attorney," 19 A.L.R.3d 575 (1968); In re Lobb's Will, 173 Or. 414, 145 P.2d 808 (Sup. Ct. 1944), and In re Lobb's Will, 177 Or. 162, 160 P.2d 295 (Sup. Ct. 1945). The "additional circumstances" requiring explanation need only be "slight." In re Rittenhouse's Will, supra, 19 N.J. at 379. The presumption is "overborne by substantial and trustworthy evidence of explanatory facts to the contrary." In re Blake's Will, supra, 21 N.J. at 58.
Here, from the testimony of Mrs. Merweedy that in the Fall of 1970 decedent told her that Sheridan "was going to have a friend" prepare another will since he could not do it because "he was going to be in her will," and Butler's testimony that he did not know decedent prior to the Fall of 1969 when she asked him to draw her will, it would appear that decedent did not independently choose Butler as the scrivener of her will. It is fair to assume from the record that she was influenced to do so by Sheridan. On the whole record before us we are thus satisfied that there were shown sufficient circumstances of a suspicious nature requiring explanation to warrant the raising of a presumption of undue influence and the shifting from the contestants to the proponent of the burden of going forward with the proof (see 5 N.J. Practice (Clapp, op. cit.), § 62 at 147), and that the proponent's testimony "did not have the convincing or impeccable quality required by our decisions to remove the aura of suspicion." In re Rittenhouse's Will, supra, 19 N.J. *67 at 382. He has failed to overcome the presumption of undue influence. Thus the will is invalid.
In the circumstances here presented the challenge to the admission of the will to probate was entirely proper and grounded in reasonable cause. The allowance of a counsel fee to the attorney for appellants was appropriate. R. 4:42-9(a)(3). That allowance "in the amount of $1,500.00 inclusive of costs" was neither inadequate nor excessive.
Accordingly, the allowance of that counsel fee is affirmed. In all other respects the judgment of the Bergen County Court, Probate Division, under review is reversed. The action of the Surrogate of Bergen County in admitting to probate the will of Jenny Olga Lehner dated November 18, 1969 is set aside, and that will is declared invalid and of no force or effect.
MORGAN, J.A.D. (dissenting).
I am constrained to dissent from the conclusions of the majority that the will in question was a product of undue influence. The evidence adduced provides substantial, perhaps even overwhelming, support for the trial judge's findings of facts and conclusions of law, and applying the appropriate scope of our appellate review, I see no warrant for interfering with the judgment entered pursuant thereto. State v. Johnson, 42 N.J. 146, 162 (1964).
In three prior wills, all of them drawn by Sheridan, decedent made no provision for her relatives who are now challenging the latest will. There is no question that, whatever her reason, she did not wish these relatives to participate in her estate to any degree whatsoever. No one even contends that decedent lacked testamentary capacity and the evidence adduced permits no such inference to be drawn. The trial judge found that despite her age she possessed sufficient capacity to make a testamentary disposition of her property, and the majority opinion does not conclude otherwise. The will was made approximately 2 1/2 years before her demise and during a substantial period of that time was in her sole *68 and exclusive possession. She could easily have destroyed the will at any time had that been her intention. She clearly understood she was making a gift to Sheridan, as her statement to Mrs. Merweedy after the will's execution indicated.
Nothing in the evidence provides any support to a conclusion that Sheridan exerted such influence over decedent as to destroy her free agency and to constrain her to do what she would not otherwise have done in the disposition of her worldly assets. Gellert v. Livingston, 5 N.J. 65 (1950).
Butler, the attorney who drew the will, was neither a partner nor associate of Sheridan. Compare In re Davis, 14 N.J. 166, 171 (1953). There is no evidence of any particular friendship or social relationship between the two attorneys. All that the record discloses is that they both practiced in the same community and were acquainted because they both frequented the same restaurant for lunch, as is so often the case. Butler testified as to what he did with respect to the drafting of the will in question. It was decedent who called him; he did not call her. There was no unseemly haste in drawing the will or having it executed. The entire procedure consumed several weeks and there is no evidence of Sheridan's participation in any step of the procedure. Butler testified that decedent appeared to know what she wanted done with her property and that she did not want her relatives to participate in her estate. She read the will over after it was drafted, was satisfied with it and duly executed it. She had more than 2 1/2 years after execution to alter or destroy it but did not do so. Nothing in the record even suggests that Butler conspired with Sheridan to convince decedent to make a disposition of her assets which she would otherwise not have made, or that he acted in any manner inconsistent with his ethical obligations.
The majority opinion refers to the presumption of undue influence which arises when a will benefits one who stands in a confidential relationship to the testator and other suspicious circumstances are shown. In re Blake's Will, 21 N.J. 50, 66 (1956). This presumption, when applicable, shifts *69 to the proponent the burden of negating any inference that the will resulted from undue influence. The mere existence of the attorney and client relationship, without more, does not, however, raise any implication of fraud or establish undue influence. In re Davis, supra, 14 N.J. at 169. Additional "suspicious circumstances" (albeit of a slight nature) are required in order to render the burden-shifting presumption applicable. The only such circumstance referred to by the majority is its conclusion that Sheridan referred Butler to decedent. In my view this fact (not found by the trial judge), even if accepted, does not constitute the "slight" additional suspicious circumstances sufficient to make applicable the presumption of undue influence. But even were the presumption applicable, Sheridan's and Butler's evidence was more than sufficient to rebut it. The trial judge subjected the circumstances surrounding the making of the will in question to "careful scrutiny" and was unable to find anything "in all of the evidence which would point to or even indicate that Mr. Sheridan exercised any form of undue influence upon the decedent which destroyed her free agency and constrained her to make a disposition of her property in any other manner than that which she expressly wished to do." The evidence received in support of that conclusion was ample. That which opposed it constitutes nothing more than unsupported conjecture or suspicion. I see no reason to interfere with the trial court judgment on the basis of the record and would affirm substantially for the reasons set forth in the trial court opinion and herein.
I agree with the majority, however, that the trial judge erred in excluding evidence concerning decedent's statements descriptive of her relationship with Sheridan and would have no objection to reversing the judgment and remanding for the purpose of receiving the excluded evidence. It should, however, be for the trial judge, and not this appellate tribunal, to pass on the effect of the new evidence, whatever it may turn out to be.
NOTES
[1] A provision of the will states:

I am mindful of my brother, ALFRED JAHN, and my sisters, MILDA BERNDT, MINNIE BERGHAUS and WALLY LEHNER, but leave them nothing for reasons known to themselves.
[2] If either should predecease the testatrix "or die under such circumstances or at such a time as to make a determination of which of us survived the other difficult or uncertain, the bequest * * * to the one so dying shall lapse and become part of" the residuary estate.
[3] Or to his parents or the survivor of them, if he should not survive the testatrix.
[4] Or all to the survivor of them; or, if both should predecease the testatrix, then to their children in trust as provided in the will.
[5] Or all to the survivor of them; or, if both should predecease the testatrix, then to their children in trust as provided in the will.
[6] The trial judge erred. The testimony should have been allowed. See 94 C.J.S. Wills § 249 at 1118-1119.
[7] The record indicates that decedent's brother, Alfred Jahn, was a resident of the State of Washington at the time of the entry of the judgment for probate in the Bergen County Surrogate's Court on May 4, 1972, and that his widow and executrix of his last will and testament, Wally Jahn, one of the moving parties (contestants) in the County Court resided in the State of Washington on the date of the order to show cause (October 3, 1972). The proceeding was, accordingly, commenced within the six-month time period prescribed by R. 4:80-7(a).
[8] In view of our ultimate holding on the appeal now before us we note, in regard to any future attack by the contestants on the validity of the earlier wills (the one in 1966 and the two in 1967), the statement of this court in In re Hand's Will, supra, that

There is ample authority for a probate court to determine at one hearing the validity or invalidity of all existing wills of a testator. [at 189]