Argued May 27, affirmed July 8, rehearing denied September 16, 1924.

# BENJAMIN R. LABEREE AND GLADYS KELLY *v.* ANITA LABEREE ET AL.

(227 Pac. 460; 228 Pac. 686.)

**Wills—Lack of Capacity to Make, Held not Established.**
1. Evidence *held* not to establish lack of capacity to make will.

---

1. What constitutes capacity or incapacity to make will, see notes in 27 L. R. A. (N. S.) 2; L. R. A. 1915A, 444.
   See 40 Cyc., pp. 1023, 1165, 1171.
   See 7 C. J., § 5 (1926 Anno.), § 12 (1926 Anno.); 21 C. J., §§ 130, 136.

Wills—Evidence Held Insufficient to Establish Undue Influence or Duress in Procuring Execution of Will in Favor of Putative Wife.

2.    Evidence *held* insufficient to establish undue influence of putative wife in procuring execution of will in her favor, or that same was made by decedent through any fear of prosecutions instituted by her parents.

Wills—Lack of Attempt to Revoke, Though Opportunity Presented, Strong Evidence of Lack of Undue Influence.

3.    The fact that testator, after execution of will in favor of wife, continued for more than two years to live with her in apparent happiness without revocation of same, though he had opportunity to do so, is strong evidence that he was not coerced into making same.

## ON PETITION FOR REHEARING.

Estoppel—Mother not Estopped by Misrepresentations as to Former Marriage from Claiming Testator was Child's Father.

4.    Where representation of testator's wife as to her former marriage and paternity of her child did not mislead contestants, or induce them to assume a different position, or mislead the testator, she was not estopped from asserting in will contest that testator was the father of her child.

Bastards—Presumption of Legitimacy Disputable.

5.    While there is a presumption of law in favor of legitimacy, it is disputable.

Estoppel—Gist of Estoppel is Conduct Leading Person to Act to Disadvantage.

6.    Gist of estoppel is that the person against whom it is urged shall have so conducted himself so as to lead the person urging it to act in a particular manner to his disadvantage.

Bastards—Declarations of Mother as to Marriage and Paternity of Child Held Competent to Contradict Testimony That Child was Son of Testator.

7.    In a will contest, declarations of a mother soon after the birth of her child as to her marriage and paternity of her child were competent to contradict her testimony that the child was the son of the testator, to whom she was subsequently married.

From Klamath: C. F. STONE, Judge.

Department 1.

This is a suit for the annulment of a will executed by Oscar G. Laberee, formerly a resident of this state, who died in Klamath County, Oregon, on September 25, 1918, leaving therein a considerable estate, comprising a 1,200-acre ranch, livestock, money in a bank.

and other property. Benjamin R. Laberee and Gladys Kelly, by whom the proceeding is prosecuted, are the son and daughter, respectively, of the deceased and Rose J. Laberee, who intermarried at Olympia, Washington, in 1887, and subsequently resided in that state until about September, 1912. The defendant, Anita Laberee, putative widow of the deceased, and the chief beneficiary of the will, was in the first instance, pursuant to the terms thereof, appointed executrix by the probate court, but was subsequently succeeded by J. W. Siemens.

The will is as follows:

"I, Oscar G. Laberee, of Bly, Oregon, being of sound and disposing mind and memory and not under fraud, duress, or undue influence, do hereby make, declare and publish this as my last will and testament, and hereby revoke and declare null and void all former wills heretofore made by me.

"First—After the payment of all just debts, I give and bequeath to my son, David, aged four years and four months, the sum of five dollars, well knowing that my wife, Anita, will make proper provision for his support.

"Second—To my son, Benjamin, I give and bequeath the sum of five dollars. I have heretofore at the time of his becoming of age given him considerable property, and his own mother will doubtless make ample provision for him.

"Third—To my daughter, Gladys, now Mrs. Tom Kelly, I give and bequeath the sum of five dollars, and as I believe that she will be amply able to provide for her infant daughter, I will make no provision for the said infant daughter. My daughter, Gladys, was provided for by me when she became of age, and will also probably be well provided for by her own mother.

"Fourth—I give, devise and bequeath all the rest of my estate, real and personal, legal and equitable, of whatsoever nature and wheresoever located, to my wife, Anita Laberee, for her sole use and benefit.

"Fifth—I appoint my wife, Anita, to be the sole executor of this my last will, and request that she be permitted to serve without bond or surety.

"In witness whereof, I, Oscar G. Laberee, the testator, have hereunto set my hand and seal and declared this to be my last will and testament this 13th day of March, 1916, the said will consisting of two typewritten pages, the first page being initialed by me for identification."

The will was probated in common form and afterwards, on the petition of the two children, Benjamin and Gladys, was again probated in this proceeding.

The causes for the contest are as follows: (1) That the will was not executed as required by law; (2) that the testator did not have testamentary capacity; and (3) that the will was executed under influence, duress and fraud. The first two causes have been practically abandoned by the petitioners, and they rely principally upon their allegation concerning duress and undue influence. Their position is stated in the following language quoted from their brief:

"While the allegations of the second amended petition are sufficiently broad to place the burden of formal proof on the proponent in the first instance, we wish, at the outset, to make it clear that contestants base their case on the charge of fraud, duress, coercion, undue influence and mistake, without reference to the mental capacity of the decedent to execute a will, except in so far as the ailments from which the evidence shows him to have suffered may have reduced his ability to resist undue influence and fraud."

The case was heard in the County Court, which sustained the will, and a like decree was rendered in the Circuit Court, and from that decree the petitioners appeal.                                        AFFIRMED.

For appellants there was a brief over the names of *Mr. O. C. Moore* and *Mr. George W. Gearhart,* with an oral argument by *Mr. Moore.*

For respondents there was a brief over the names of *Messrs. Winter & Maguire* and *Mr. Charles J. Ferguson,* with an oral argument by *Mr. J. P. Winter.*

McBRIDE, C. J.—A full statement of the testimony in this case reads like some of the late novels about life in Alaska, except, if that were possible, that it is in some respects nastier.

The decedent, Oscar G. Labree, was first married in 1887, at Olympia, Washington, to his wife Rose J. Laberee. The contestants are the only children of this marriage. Gladys Labree Kelly was born in 1888, and Benjamin R. Laberee was born in 1891. Mr. Laberee was divorced by his first wife. The decree was entered in the Superior Court of the State of Washington for Spokane County on the fifteenth day of September, 1915, but the cause was actually tried and determined by the court and the findings of fact made on the tenth day of September, 1915.

On the eleventh day of March, 1916, in Seattle, Washington, Oscar G. Laberee married or went through the forms of marriage with Anita Rhoades, or Anita Lawrence, as she is termed in the petition. The statute of Washington provides, in substance, that a marriage performed within six months from the date of the entry of a decree of divorce is void, and it is plain that this marriage was performed within less than six months from the date of such entry, the parties having possibly assumed that the entry was made on the date of the decree.

Prior to the time that Oscar G. Labree was divorced by his wife he had made a property settlement with

her, by which he had given her, apparently, one half of all of his property. Indeed, we judge from the testimony that she was very much the gainer by such division and that he really, in the outcome, retained a less share of the property than she received by the settlement.

It is claimed here that the divorce of the first wife was procured by fraud, in that she was not a resident of the state of Washington at the time she filed her suit, but, on the contrary, was a resident of the State of Illinois; the statute of Washington requiring one year's residence in the state before a divorce suit may be commenced in its courts. It appears clearly in the testimony that Mrs. Rose Laberee alleged in her complaint that she had been a resident of the State of Washington for one year before commencing suit, and that she and another witness so testified upon the stand, and the court made its findings accordingly. There was some testimony tending to show that the divorce was in fact collusive, although the facts shown here and in that case were amply sufficient to have entitled Mrs. Rose Laberee to a divorce, had the question of jurisdiction not entered in. But, in our opinion, neither of the questions above mentioned is material here. Whether the divorce was legally granted or not, or whether the decedent was legally married to his alleged second wife, do not, to us, seem to be material in this proceeding. Oscar Laberee had the right to make a will and to dispose of his property to anyone he saw fit, and, while the conduct of the decedent appears to have been reprehensible in the extreme in many particulars, still this fact would not affect the validity of his will unless it was procured by duress and undue influence.

112 Or.—4

The story of his connection with his second wife, Anita Laberee, is, in its bare particulars, as follows: He first met her in Seward, Alaska, where he had extensive interests, in the year 1908. At that time she was a girl of eighteen years of age. She says, and her counsel says, that she was an inexperienced girl, of which fact there is room for considerable difference of opinion. Mr. Laberee at that time was past forty-four years of age and occupied the position of president of a railroad in Alaska which was afterwards sold to the government. Their association, while Anita was in Seward, seems to have been very close, so much so as to have excited some comment, although there is no conclusive evidence that it was meretricious. In 1910 Anita concluded to go to New York for the purpose of studying music, and the decedent suggested to her mother that a cousin of his by marriage, Mrs. Carrie Laberee, should accompany her in the capacity of chaperon. There is no direct evidence that Oscar Laberee furnished Anita the money to go to New York or to take music lessons, but he followed her to New York, and she claims that while under the cheering influence of a wine supper, *Anglice* drunk, he there accomplished her ruin. Shortly after that, in company with Mrs. Carrie Laberee, she made a tour of Europe; being absent for a period of several months and visiting Naples, Florence and different cities in Italy, thence to Paris, and returning to New York. Anita claims that the money was given to her by her mother and fixes the sum as $1,250, and claims that with this sum she paid the expenses of a trip to New York and a tour of Europe, both for herself and her chaperon; a statement which, while impossible of contradiction, would seem to be the subject of some legitimate doubt. At

any rate, shortly after her return to New York she gave birth to a child, whom she named David, which child was recognized by the decedent as his son David in his will. After his second marriage Mr. Laberee lived a quiet and happy life on his farm near Bly, Oregon, with his wife Anita.

1. There is no evidence that tends to show any lack of capacity to make a will. The decedent was a man of large affairs, successful in business, and trusted by his associates on account of his business ability, which evidently was much above the average, and there is nothing in the accounts of his life that would indicate any mental defect that would subject him to undue influence from anybody. There is some testimony tending to show that at one time, several years before his second marriage, he had stated that he was greatly in fear that the father and mother of Anita would have him prosecuted under the Mann Act. He so stated to Senator Turner of Spokane, probably about the year 1915, and also to his former wife, urging that as one of the reasons why he would like to be divorced, although there seems to be some hiatus between the premises and the conclusion, as it was never intimated to his wife, as far as we find from the testimony, that he wished to be divorced for the purpose of marrying Anita and silencing a possible, or probable, prosecution. It does appear from the testimony that while Anita was in Europe he improved the shining hours by some other illicit connection in Alaska which resulted in his acquiring syphilis, from which he suffered rather severely and which at one time threatened his eyesight, but by judicious use by his physicians of "606" and other remedies he was apparently cured at the date of his second marriage.

A few days after his second marriage he visited an attorney in Portland, Oregon, and stated to him that he wished to make a will and gave him the particulars of the proposed will, which are embodied in the document offered in court in the present proceeding, and also suggested a will somewhat similar in terms, to be executed by his wife. Subsequently both he and Anita visited the attorney by whom the wills were prepared and regularly executed them. The attorney observed no signs of mental weakness or decay in the decedent, but, on the contrary, was impressed by his fine appearance and apparent business capacity. Neither was there, in his presence, any interference or suggestion by Anita as to the contents of either will, but the attorney states that she was "as quiet as a mouse" and seemed to follow him along.

2. There is nothing in the testimony that indicates that the second wife ever, at any time, either before or after the marriage, suggested any prosecution or used any threat in order to have a will executed in her favor, or to induce decedent to marry her. The father of Anita was not produced upon the trial, and the mother, being a witness, denied any intimidation, threats or coercion, in the matter. Considering the decedent's business habits, and his general, filthy, habits of association with women, we cannot conclude that there was any such fear of prosecution on his part as would have induced him to make a will in favor of Anita if he did not wish to do so, or to marry her against his wishes. On the contrary, while his attentions to her were unlawful, and the desertion of his former wife not to be defended from a moral standpoint, we take it that in his coarse way he had a sincere affection for Anita, and that his association

and marriage with her were the result of such affection and not of any fear of legal consequences and that his making a will in her favor was the result of his affection and not produced by any deceit or coercion on the part of Anita, or anybody else.

It is urged that decedent was deceived by Anita in regard to the paternity of the child David, and it is in evidence that when she returned from Europe she represented to her mother that she had been married to a man by the name of Lawrence, who was the father of David, and that he had died while in Europe; in fact, she admits saying so and gives as a reason for so doing her desire to escape her mother's censure, as well as avoiding the public disgrace of being the mother of an illegitimate child. The explanation is exceedingly plausible, and she and the decedent come nearer knowing the real facts about the paternity of the child than anyone else. Decedent recognized him as his son, and, even if he took upon himself the paternity of another man's child, it cuts no figure in this case. We think that he was in no way deceived in respect to the matter.

3. There is a long chapter of dreary and filthy detail in regard to the relations of the parties, which it is useless to discuss here. Suffice it to say that after making the will the decedent lived for two years more, in apparent amity and happiness with Anita, having the will all of the time in his possession and having every opportunity to revoke it without her knowledge if he had chosen to do so, which, in itself, is strong evidence that he was not coerced into making it, but that it was entirely satisfactory to him when made and that that satisfaction continued until his death.

Being thus satisfied that it is decedent's will, executed without fraud, duress or coercion, the decree of the Circuit Court will be affirmed.        AFFIRMED.

BURNETT, RAND and COSHOW, JJ., concur.

---

Rehearing denied September 16, 1924.

ON PETITION FOR REHEARING.

(228 Pac. 686.)

For the motion, *Mr. O. C. Moore.*

*Contra,* no appearance.

McBRIDE, C. J.—In a very careful and plausible petition for rehearing counsel calls our attention to the following statement in the opinion:

" * * It was never intimated to his [Laberee's] wife, as far as we find from the testimony, that he wished to be divorced for the purpose of marrying Anita and silencing a possible, or probable, prosecution."

The accuracy of this statement is challenged by counsel, who calls our attention to the following excerpt from Mrs. Rose J. Laberee's testimony:

"Q. And by whom did he say he was attacked, or who was threatening this prosecution?

"A. Her mother principally, and she too. 'They,' he always spoke of them as 'they.'

"Q. How was the prosecution to be obviated by your getting a divorce? How would that obviate it?

"A. By marrying the girl.

"Q. Did he say so?        A. Yes.

"Q. Did he tell you whether those were the conditions on which the prosecution was to be avoided as between him and the girl?    A. Yes."

The statement in the opinion was inaccurate, but the testimony above quoted is far from convincing. The answer last quoted was substantially elicited by a leading question, and from a witness having a large moral interest hostile to the contentions of Anita, and whose testimony is obviously inaccurate in other respects—for instance, when she testified, in substance, that she took little or no interest, or. at least paid little attention to the division of the property between herself and her husband, and later an itemized list of it in her own handwriting was produced and shown to her upon cross-examination. The reason given by her for going through the divorce proceedings, namely, to stifle prosecution by putting her husband in a position to marry Anita, while possible, is very improbable. It is the old story of "The Lady or the Tiger?" over again. Most wives would choose that the recalcitrant spouse would fight the tiger, rather than surrender him to the lady.

Death has sealed Laberee's lips. He cannot give his side of the controversy. But taking Mrs. Rose Laberee's statement as true (though we in fact doubt its accuracy), it does not prove or tend to prove that the will in question was the result of a fear of a prosecution which had already been substantially stifled by the marriage between Laberee and Anita. As stated in the opinion, he had been in a position for two years after his marriage with Anita to have revoked his will and made a new one in favor of his first wife or their children without danger of prosecution or detection, and this would have been the natural course for him to have pursued if he had been

forced into a loveless marriage to escape going to jail. Whatever his sins of omission or commission may have been (and they probably have been somewhat magnified), it seems from the testimony that he lived happily with his second wife, and that his affection for her was reciprocated. If he had in fact seduced her, he owed her reparation; if, on the contrary, she was a dangerous, designing woman, intent on getting his money, he no doubt could have settled the matter financially at as little, or perhaps much less expense than the division of his property with his wife cost him. We do not believe that he was forced into the marriage, or into the execution of the will.

4. The assumption that the fact that Anita represented not only to her mother, but to others as well, that she had been married to a man by the name of Lawrence and that he was the father of her child ''David'' and that he died in Europe estops her from afterward or now asserting that Laberee was its father is untenable. If Laberee was in fact its father, three alternatives were presented to her— either to abandon the child, as some heartless women do under such circumstances, or to concoct a falsehood as to her marriage and the death of the assumed husband, or to submit to the open shame of acknowledging to the world that she was the mother of a bastard. That she chose to keep and care for her offspring and concoct a falsehood as to its paternity, and thus save herself and the child from the opprobrium of having given birth to a bastard, was not unnatural. Anita's mother testifies, substantially, that Laberee confessed to her that he was the father of David and a party to the deception practiced upon her by Anita. While it is somewhat difficult for a man to know whether or not he is the father of a particular

child, Laberee had facilities for checking up the date of his lewd association with Anita so as to satisfy himself to a reasonable certainty as to whether David was his offspring, and he was so satisfied. It will be remembered that he left David only a nominal sum ($5) in his will, and the contention that he left the bulk of his property to Anita by reason of the fact that he mistakenly believed, or was defrauded into believing, that she was the mother of his child is far-fetched.

5–7. While it is true that the presumption of the law is in favor of legitimacy, it is a disputable presumption, which is overcome in this instance by the statements of Anita and Mrs. Hill and the circumstances appearing in the testimony in this case. There is no estoppel in this case. The gist of an estoppel is that the person against whom it is urged shall have so conducted himself as to lead the person urging it to act in a particular manner, to his disadvantage. Anita's statement that she had been married to a man by the name of Lawrence, and that David was the issue of that marriage, did not mislead the contestants here or in any way induce them, acting on such statement, to assume a different position, to their prejudice. It did not, in our judgment, mislead Laberee, who was in a position to ascertain with some degree of certainty whether he was the probable father of her child. That these declarations were competent evidence tending to contradict her present statements is undoubtedly true. There is no evidence that she ever made them to Laberee. On the contrary, the evidence indicates that she did not, but that the story of her previous marriage was concocted between her and Laberee to protect her reputation in the public esteem and to avoid the censure of her

mother. Anita says David was the son of Laberee. Laberee in his lifetime acknowledged him as such in his will, and we believe that his judgment in the matter was correct.

A statement in the opinion that Laberee contracted syphilis while Anita was in Europe in 1911 is challenged. Dr. Council stated that he treated him for syphilis in Alaska in 1908. Whether he cured him of that attack does not appear, as Dr. Council's statement appears to be missing from the files here. Dr. Peterkin, of Seattle, testifies that Laberee came to him for treatment on May 21, 1911, and that he found him suffering from an acute attack of syphilis and treated him until the blood tests ceased to indicate a syphilitic condition. The disease being then in the acute stage would indicate that it arose from a new infection and not secondarily from the attack treated by Dr. Council. Whether this is the fact or not is immaterial. There is no indication that the consequences of it affected his mentality at the time he made the will, and the fact that David at nine years of age is apparently a very healthy boy does not indicate that he is not Laberee's son. Such an assumption is purely speculative.

We adhere to our former conclusion.

REHEARING DENIED.

BURNETT, RAND and COSHOW, JJ., concur.