Argued April 4, affirmed May 15, 1957

IN THE MATTER OF THE ESTATE OF CHARLES E. ROBLIN,
DECEASED

ROBLIN *v.* SHANTZ, EXECUTRIX

311 P. 2d 459

*J. Ray Rhoten* argued the cause for appellant. On the brief were Rhoten, Rhoten & Speerstra, Salem.

*E. L. Crawford,* Salem, argued the cause for respondent. With him on the brief was John F. Steelhammer, Salem.

Before PERRY, Chief Justice, and ROSSMAN, BRAND and McALLISTER, Justices.

ROSSMAN, J.

This is an appeal by Charles Dana Roblin, contestant, from a decree of the Circuit Court for Marion County which dismissed proceedings he had instituted to contest the will of his father, Charles Ernest Roblin, and which ordered that the will be admitted to probate.

Charles Ernest and Ollie M. Roblin, both now deceased, were the parents of the appellant, Charles Dana Roblin, and of a daughter, Ruth Emily Shantz, proponent and respondent. For convenience we will refer to the elder Charles Roblin as Mr. Roblin and to the younger as Charles.

The family resided for many years in Salem. When Ruth married Carl Shantz they took their residence in Milwaukie, Oregon. Charles became a peripatetic, but during summer months returned to Salem for extended visits in the family home. In 1950 Mr. Roblin left the family home and made his abode in a Salem hotel. Ruth testified that he left in aggravation over his wife's conduct in sending money to Charles and paying his bills. In 1951 Mr. Roblin suffered a stroke and shortly repaired to a nursing home in Salem.

In the fall of 1951, Ruth, at her father's instance, arranged for him to undergo an eye operation in Portland. In that period he resided with Ruth and her husband for seven months. After he had recovered from the operation he returned to the nursing home where Ruth visited him every two weeks. Mrs. Roblin also called upon him from time to time, being driven to the nursing home in the Roblins' car by Charles. The latter, however, did not enter the home. Upon an earlier occasion when he attempted to visit his father, the latter ordered him out of the room in no unmistakable language.

Mrs. Roblin executed a will on July 3, 1953, and died five days later. Her will bequeathed all of her property equally to both children. Its terms were operative on property appraised at $1,581. But Charles received, in addition to his half of that sum, property worth $12,301.06 which was not part of the estate

proper. This greater amount represented accounts and chattels the title to which was in Charles and the mother jointly, and to which he survived.

On either the evening of July 8 or the morning of July 9, 1953, Ruth visited her father in the nursing home and informed him, perhaps in response to his inquiry, that her mother had left everything to Charles except a diamond ring. Immediately Mr. Roblin ordered Ruth to obtain for him a lawyer. Ruth suggested a Mr. Steelhammer who was her husband's cousin. The suggestion was acceptable to her father, he having known Mr. Steelhammer through their mutual membership in the Salem Elks Lodge. On the morning of July 9 Mr. Steelhammer went to the nursing home and conversed in privacy with Mr. Roblin, who directed him to prepare a will, leaving Charles one dollar only and the remainder to Ruth. The father also requested Mr. Steelhammer to prepare a petition for a conservatorship of the father's property with Ruth as conservator. That afternoon, Ruth, upon Mr. Steelhammer's request, drove him to the nursing home. When they arrived, the attorney alone met with the testator, who then executed his will, with Steelhammer and the operator of the home as witnesses. The will nominated Ruth as executrix and left to her everything except one dollar which was bequeathed to Charles. The petition for conservatorship was filed on July 20. Mr. Roblin died September 6, 1953, aged 83.

Charles has attacked his father's will with these three contentions: (1) the father lacked testamentary capacity; (2) the instrument represents the undue influence of Ruth in that it is her will and not the father's; and (3) the statement of Ruth to her father that Charles got everything except a ring from the mother's estate amounted to fraud.

The last will of Mr. Roblin was properly executed with all the formalities required by law. It is rational on its face. We need not, however, indulge in presumptions in order to establish the testator's testamentary capacity, for the record convinces us that such capacity existed. Mr. Roblin fully understood the nature of the testamentary act. He requested of Mr. Steelhammer that his will be drafted and was explicit as to its contents. At its execution, he expressed satisfaction with it. The record so clearly evidences that Mr. Roblin recognized the natural objects of his bounty and their relationships to him that this requisite of testamentary capacity requires no discussion.

■ The contestant's principal evidentiary support for an assertion that the testator lacked capacity for will-making lies in the testimony of the draftsman, Steelhammer. When the testator and his attorney discussed the contents of the will about to be drafted, Mr. Roblin referred specifically to only three items of his property—his home place, an arrowhead collection and an elk's head which he desired the Elks Club to have. He referred to his home place as "about his only possession, as far as that is concerned." The file of the Estate of Charles E. Roblin contains no complete Inventory and Appraisement, nor Report to the State Treasurer, so we do not know which of his possessions were not discussed that day. The home place certainly constituted the major item of his estate. Contestant contends that the absence of any discussion of insurance payable to the estate evidences a lack of capacity. We do not agree. Very likely few testators recite an inventory of their belongings before executing their wills. This testator, in his first conversation with Steelhammer, alluded to three tangibles of particular interest to him. If anything, this is affirmative evidence that he com-

prehended the nature and extent of his disposable assets.

■ The rule is most frequently stated in Oregon decisions that, in order to possess testamentary capacity, the testator must understand and appreciate the nature of the testamentary act, the natural objects of his bounty, and the nature and extent of his property. *Re Phillips' Will,* 107 Or 612, 213 P 627; *In re Estate of Verd Hill,* 198 Or 307, 256 P2d 735. Perhaps a more precise expression of the rule is that of *In re Walther's Estate,* 177 Or 382, 163 P2d 285; that is, the testator must understand the nature of the testamentary act, and possess the ability to know and appreciate the natural objects of his bounty and the nature and extent of his property. Under either expression, the mental faculties of Mr. Roblin qualify.

That the testator, on the day on which he executed his will, requested the appointment of a conservator does not persuade us that he lacked testamentary capacity. Quite clearly, the request flowed from an understanding of the responsibilities attendant upon the management of his income properties and a realization that such responsibilities could best be discharged by another. After Ruth was appointed conservator, her father expressed to her suggestions and requests with respect to the management of his affairs. This is no evidence of an absence of testamentary capacity. Lack of desire to manage one's affairs inter vivos and the ability to direct lawfully the disposition of one's property after death are different from one another.

The contestant next urges us to vitiate the will because it was drafted and executed, so he contends, in response to undue influence expressed by Ruth.

The petition for contest alleges that in his dotage and debility, Mr. Roblin entrusted the management

of his affairs to Ruth, who ultimately exercised dominion and control over him. The proof falls short of establishing this allegation as fact. After Mr. and Mrs. Roblin were estranged, the wife continued to give attention to his affairs while he was in the nursing home until her death. Ruth's management was intermittent. Her direction of his interests was exerted principally while he resided in the Shantz home in Milwaukie and the period of time subsequent to the mother's death.

While the record discloses that Ruth held an unrevoked absolute power of attorney from her father, dating from the time of his near-blindness after the eye operation in 1951, no relevant instances of its exercise appear in evidence. The existence of the power denotes that Ruth had her father's confidence, but it does not show that she ever attempted to influence him.

We have mentioned the manner in which Mr. Steelhammer was selected as draftsman of the will July 9, 1953. The contestant, in his efforts to establish undue influence, alleges that Steelhammer was Ruth's attorney and not her father's. Although Steelhammer had not been employed by the testator before that day, neither had he performed any services for the Shantzes. Mr. Steelhammer, a reputable attorney and unimpeached witness, testified that all suggestions about the substance of dispositive provisions came from the testator. Later, in the presence of Steelhammer and the operator of the nursing home, the testator, voluntarily declared the will to be satisfactory to him. We perceive no sinister implications in the relationship of Steelhammer and Carl Shantz. The members of a profession are not required to decline to perform services for persons referred to them by relatives.

In 1951, in her Milwaukie home, Ruth either dis-

suaded her father from making a will or responded to his declaration of intent to make a will by suggesting that he not do so. Her motivation, according to her testimony, was a fear that the execution of a will by her father at that time would prevent a possible reconciliation of her parents. Disregarding all consideration of motivation, evidence of such dissuasion related too indirectly to the execution of the will now under consideration to support a finding of undue influence with respect to this will. Had Mr. Roblin died intestate by virtue of such dissuasion, Charles would have received that portion of his father's estate he now seeks. Undue influence must manifest itself and be exerted about the time of the execution of a will in order to vitiate it. *In re Southman's Estate,* 178 Or 462, 168 P2d 572; *In re Estate of Verd Hill,* supra. Ruth's suggestions of 1951 had no effect upon the will now under attack.

Ruth managed her father's affairs when he resided with her in Milwaukie. When he returned to Salem, Mrs. Roblin again assumed such management. She died July 8, 1953. Ruth testified that she reassumed that function after her mother died. Mr. Roblin's will was executed July 9.

■ All agree that the burden of establishing undue influence is upon the contestant. The latter urges that in this case but slight evidence is required to cast upon Ruth the burden of explanation and of disproving undue influence, because of the purported confidential relationship.

■■ In order even that the burden of coming forward with the evidence shift to the respondent, more than the bare confidential relationship must be established. We must be shown suspicious circumstances. *In re Southman's Estate,* supra; *In re Estate of Porter,* 192 Or 483, 235 P2d 894. Chief among these is the bene-

ficiary's participation in preparing and executing the will. *In re Rupert's Estate,* 152 Or 649, 54 P2d 274; *In re Scott's Estate,* 191 Or 90, 228 P2d 417. The only evidence from which we might deduce such participation is that Ruth suggested to her father the name of the draftsman, Steelhammer; that he was Ruth's husband's cousin; and that, after the will was drafted, Ruth drove Steelhammer, at his request, to the nursing home in order that the will might be executed. Ruth was not present at the execution. The uncontested testimony of Steelhammer negatives any influence he might have had over the testator in determining the import of the dispositive provisions. Indeed, we feel that Mr. Steelhammer unfairly suffers a misfortune in that this opinion must discuss his participation in an alleged scheme to impose upon the testator, when his participation was patently innocent of any legal or ethical wrongdoing. We must conclude that the contestant was never relieved of any element of the burden of proof in this case. No suspicious circumstances have been proved. Even the confidential relationship has been assumed for purposes of our discussion when its actual existence is questionable.

The principal thrust of contestant's attack upon the will is that, according to him, Ruth's statement to her father that she received nothing from her mother but a ring while her brother took all, was knowingly false and fraudulent and that its effect was, as intended, to cause Mr. Roblin to give his entire estate to Ruth. Contestant submits that, though his father may have executed his will voluntarily, the execution resulted from a misunderstanding of fact intentionally created by a false statement made to him.

■ Courts set aside wills whose provisions reflect the testator's belief in false data arising from fraud-

ulent misrepresentation made to him by a beneficiary. *In re Estate of Rosenberg,* 196 Or 219, 246 P2d 858.

> "Fraud which causes testator to execute a will consists of statements which are false, which are known to be false by the party who makes them, which are material, which are made with the intention of deceiving testator, which deceive testator, and which cause testator to act in reliance upon such statements."

1 Page on Wills, 3d Ed, 347, § 176. Absent any one of the elements of that definition of fraud, no ground for contest is established.

■ The statement which we are considering, and the consequences of its utterance, must be measured against the elements of fraud which vitiates a solemnly executed will.

The statement must be false and known to be such by the maker. In fact, Ruth's mother did not leave everything, except a ring, to her brother. Ruth was to receive half of $1,581; the other half of which went to Charles along with the $12,301.06 in jointly held property to which Charles survived. After the expenses of administration and taxes were paid by that estate, Ruth received $61.90. Charles received from his mother $12,367.96. The disparity is so great that Ruth may be excused for having been piqued, as is Charles now.

We must distinguish between a belief in the literal truth and falsity of a statement and that type of belief in falsity that underlies the fraudulent misrepresentation. Ruth testified at trial that "The only thing one could say, or I did say, was that Mother had left everything to Charlie." In this context a belief in the falsity of an utterance must be defined with regard to the nature of man and his reactions to an unexpected disappointment. The testimony just quoted demonstrates

that at the time of utterance, and indeed at the time of trial, after reflection, Ruth doubted not that the hyperbole fairly described the division of her mother's estate.

The speaker must intend to deceive, and succeed. We are unwilling to decide that even a conscious exaggeration necessarily imports an intent to deceive. Even people of high character often exaggerate in order to express their belief with clarity and force. The purpose in instances of that kind is not to deceive, but better to communicate the belief. We are convinced that the statement made by Ruth is an example of that process. The speaker may in perfect good faith omit what he considers to be a non-material qualification upon his broad statement, thinking that a recital of all the details merely obfuscates the main point.

The misrepresentation must cause the testator to act upon it. In other words, the will must be the fruit of the fraud. In the Roblin family, little family unity or mutuality of attitude toward life bound father and son together. We know that the father emphatically expressed a desire that Charles stay away from the nursing home so that the two would not meet. Evidently, the wanderlust of the son was a canker to the parent. The learned trial judge would have been justified in a conclusion that the statement made by Ruth did not cause her father to rely upon it in the execution of his will, but rather that the statement merely provided an occasion for the taking of a step which the disappointed parent may have independently taken even if the statement had never been uttered.

The testimony of Ruth and of Charles conflicts in that she states, and he denies, that all her information about the division of their mother's estate came from him. If one believes her account, which the judge be-

low may have done, her statement to her father cannot be objectionable. In that event, she merely relayed information which Charles gave her.

Both parties testified on direct and on cross-examination at some length about the amount of money each had received from Mr. and Mrs. Roblin inter vivos. We deem this evidence irrelevant. The statement of Ruth which is objected to refers only to the disposition of her mother's property upon her death. It does not relate to the inter vivos gifts to the children, of which Ruth received the greater share. Consequently the truth or falsity of the statement stands independent of the history of inter vivos donations.

Agreeing, as we do, with the disposition of this matter by the judge below, we affirm his decree.

Affirmed.