Argued April 20, affirmed June 8, petition for rehearing
denied July 5, 1960·

IN THE MATTER OF THE ESTATE OF
CHESTER L. McCASLIN, DECEASED
McCASLIN *v.* MUMMERY ET AL
352 P. 2d 1111

*John E. Walker,* Portland, argued the cause for appellant. With him on the briefs was Glenn R. Jack, Oregon City.

*Robert M. Mulvey,* Oregon City, argued the cause and filed a brief for respondents.

Before McALLISTER, Chief Justice, and ROSSMAN, WARNER and HARRIS, Justices.

## WARNER, J.

This is a will contest instituted by C. E. McCaslin, a brother of the testator, protesting the probate of the last will and testament of Chester L. McCaslin, deceased. From an adverse decree, the contestant appeals.

In March, 1955, decedent, a bachelor, then about 72 years old, established residence in Willamette View Manor, near Milwaukie, Oregon. This is an institution owned and operated by the Oregon Methodist Homes, Inc., a nonprofit corporation, which, as a matter of convenience, we will hereinafter refer to as "the Manor." It offers to its members rooms and apartments and attractive living accommodations and facilities and limited medical and hospital services. The Manor caters to retired elderly persons desiring to make the place their home in comfort during their last years, requiring, in addition to a monthly charge, a payment of a substantial lump sum upon entry.

On August 15, 1955, decedent executed his last will and testament, drawn at his request by Mr. Paul R. Biggs, an attorney at law, practicing in Oregon City. It makes the Oregon Methodist Homes, Inc., the sole beneficiary of his entire estate, amounting to approximately $90,000, and named Clyde W. Mummery, the executive administrator of the Manor, as testator's executor.

The contestant challenges the will on the ground that Chester L. McCaslin lacked testamentary capacity and was the subject of undue influence on the part of the representatives of the beneficiary.

Our review of the record leads to the conclusion that there is no merit in either claim. We find that notwithstanding McCaslin experienced some of the infirmities usual for a man of his years, he was, as said by Dr. Lathrop, "completely alert and coherent as compatible with his age" and with "no sign of any lack of any type of perception that would influence his ability to make a decision." This medical estimate is amply fortified by the observations and testimony of

other disinterested parties living within and without the Manor. We are persuaded beyond any doubt that the testator was fully competent to make and execute the will he did on August 15, 1955.

There is no purpose in delineating the evidence, which, in our opinion, warrants our judgment, except in so far as may be necessary to give consideration to one facet of the case which appellant claims is of significant importance. We refer to the relationship of Mr. Biggs to the Oregon Methodist Homes, Inc., for which he was both secretary and counsel.

■ We are not unmindful of the rule which treats the preparation of a will by one who is the attorney for the sole beneficiary as a circumstance giving rise to a suspicion of undue influence on the part of the beneficiary.

But at no time have we decried the employment of such attorney as an incident which *ipso facto* operates to defeat the will so drawn. Standing alone, it is at best only a "suspicious circumstance" strongly suggesting the need of further inquiry. As many of our opinions disclose, ofttimes the information thus obtained completely dispels any shadow of suspicion so cast and confirms such attorney and client relationship as a valid and meritorious one, justifying no judicial reproval of the activity, if any, on the part of the beneficiary or beneficiary's legal counsel.

■ Again, we also observe that motive and opportunity to exercise undue influence upon a testator are not enough. There must be proof that undue influence was actually exercised and not only so, but that it was pushed to such an extent that the resultant will was not that of the testator but that of the parties procuring it. *In re Will of Pittock,* 102 Or 159, 174, 199 P

633; *In re Estate of Verd Hill,* 198 Or 307, 344, 256 P2d 735; *Roblin v. Shantz,* 210 Or 371, 378, 311 P2d 459; *Clauder v. Morser,* 204 Or 378, 390, 282 P2d 352.

Cases wherein this court has directed its attention to the question of undue influence alleged to result from the status of the draftsman of the testamentary document, can be divided into two categories. The first is derived from situations where the attorney is the testator's principal beneficiary. The other category encompasses circumstances wherein the will is drawn by an attorney retained or selected by a principal beneficiary who is in a confidential relationship with the testator.

One of the most flagrant cases falling in the first classification is *In re Brown's Estate,* 165 Or 575, 108 P2d 775, cited here by the appellant. There, we took great care to indicate that the circumstances attending the execution of the will were the controlling factors, saying at p 586 we considered the pertinent inquiry to be:

"* * * whether defendants [the proponents of the will] have overcome such presumption by showing that [the testator] freely and understandingly executed the will. Does the will truly reflect what the testator had in mind or does it express what the defendants had in mind?"

See, also, *In re Johnson's Estate,* 162 Or 97, 130, 91 P2d 330; *In re Murray's Estate,* 173 Or 209, 224, 144 P2d 1016.

Under similar circumstances, *In re Lobb's Will,* 177 Or 162, 191, 160 P2d 295, another case relied upon by appellant, wherein the attorney under whose direction the will was drawn was the principal beneficiary

and the will executed by the testatrix without independent advice, we based our decision:

"\* \* \* upon the narrow ground that he [the attorney-beneficiary] failed satisfactorily to repel the inference of undue influence which the circumstances raised against him, \* \* \*."

Decisions illustrative of the second category are: *In re Estate of Urich,* 194 Or 429, 242 P2d 204; *In re Estate of Manillus Day,* 198 Or 518, 257 P2d 609; *Clauder v. Morser,* supra (204 Or 378). In these cases, cited to us by appellant, and like cases of this character, we have been consistently concerned with all of the evidence of the attendant circumstances to ascertain whether or not any suspicion of undue influence, accruing by reason of the relationship between the drafting attorney and the beneficiary, has been dispelled.

*In re Estate of Urich,* supra, we expressed the view, at p 445, that:

"Ordinarily, the burden of proof of undue influence is upon the party who asserts it. But there may be circumstances which cast upon the beneficiary the burden of disproving undue influence. *Each case must be decided upon its own peculiar facts. There is no fixed rule that is decisive in all situations.* \* \* \*" (Emphasis supplied.)

Turning to *In re Estate of Manillus Day,* supra, at p 533, it will be found we did not rest our conclusion alone upon the fact of the procurement of the draftsman-attorney by the principal beneficiary, but specifically pointed to five other suspicious circumstances justifying the finding of undue influence which invalidated the will.

In *Clauder v. Morser,* supra (204 Or at 389), we

held that notwithstanding that the testatrix' will was drawn by the beneficiary's attorney, the presumption of undue influence was overcome by certain evidence of circumstances to the contrary.

As shown in the cases to which we have made reference and wherein the draftsman of the will is a principal beneficiary or attorney for the beneficiary, we have never allowed ourselves to be bound by that single circumstance. To the contrary, we have attempted to place that particular fact in its proper context and have examined the record in its entirety to ascertain the existence of sufficient evidence, if any, to dispel the shadow of undue influence cast by the existence of such relationships.

■ This court has recently suggested that the test of undue influence is: "has the influencer by his conduct gained an unfair advantage by devices which reasonable men regard as improper?" *In re Reddaway's Estate,* 214 Or 410, 419, 329 P2d 886.

5. Before reaching our discussion of the facts, we refer to another well-settled rule prevailing in this jurisdiction. It is: influence arising from gratitude, affection or esteem is not undue, nor can it become such unless it destroys the free agency of the testator at the time the instrument is executed, and shows that the disposition which he attempted to make therein results from the fraud, imposition and restraint of the person whose superior will prompts the execution of the testament in the particular manner which the testator adopts. *In re Darst's Will,* 34 Or 58, 65, 54 P 947; *Evans v. Anderson,* 186 Or 443, 470, 207 P2d 165; *In re Estate of Verd Hill,* supra (198 Or at 335).

With the foregoing in mind, we now give our attention to the record in so far as it bears on the status of Mr. Biggs' attorney-client relationships.

We think it a matter of related significance that all witnesses when interrogated concerning decedent's temperament and personality were in accord that Mr. McCaslin was a very strong-minded and opinionated person, and not easily dissuaded from his "set ways" of thinking. Dr. Lathrop, who, during McCaslin's residency, was house physician, summarizes this aspect by describing him as a "strong-willed sort of person; had been a bachelor all his life and knew about the way he wanted things and insisted that they be that way." The doctor also stated that he was not a man to be easily influenced by others. Some witnesses also added that he was "kind and appreciative" and we learn from some of his old friends, particularly associates in the Odd Fellows Lodge, that he was given to quiet and unostentatious charities and was said to be "quite generous in his own way" but "never gave anybody anything that asked him for it."

The record is also replete with testator's expressions of great satisfaction concerning the Manor, expressions made both before and after he had executed the challenged will. From friends outside and from fellow residents in the Manor, some called by appellant and some called by the will's proponents, we learn of his oft-repeated and enthusiastic praise for the Manor. To one he reported: "He was enthusiastic about his treatment there" and was credited with saying: "they couldn't have treated him nicer if he had been a prince." To others, he described the Manor as the best place he had ever lived, and where he was treated better than ever before. Thus, he often referred to the Manor when telling others about it. Cora McCaslin, wife of the appellant-contestant, produced a letter written to her husband by the decedent under date of December 11, 1956, well over a year after

making the instant will, wherein he said *inter alia*: "I am awfully glad I had sense enough to sell my home and buy a home here [referring to his residency in the Manor]. No one could get better care than I am getting."

From the testimony of disinterested parties, it is evident that his appreciation of the place where he last lived and his determination to favor it in his will had its origin sometime prior to the execution of that instrument and continued unabated until the date of his death.

Thus, Mrs. McClanathan, an elderly retired graduate nurse and fellow member, tells us that after "he first came in [the Manor]" and when there but a short time, he told her: "He thought he never had lived in a place where he had been so nicely treated and it was such a wonderful home to him in [sic] that he would like to leave his money for those who might need it eventually" and he "intended to leave it to the Manor."

Before more particular reference to the persuasive testimony of Mr. F. P. H. Mills, we note that Mr. Mills was an accountant, with offices in Milwaukie, Oregon, and lived not far distant from the Manor. McCaslin and Mills had known each other for nearly 30 years. During that time their friendship had the additional bond of membership in the Odd Fellows Lodge in which both had a deep and continuing interest. Mr. Mills also prepared McCaslin's income tax returns for the tax years 1954 and 1955, and possibly for years prior thereto. This was a further reason for the decedent's frequent visits to Mr. Mills' office in Milwaukie and where the prospective making of his will was the subject of numerous conversations between them several months before it was executed in August, 1955. In recounting these visits, Mr. Mills said Mc-

Caslin had indicated to him his proposed benefactions and Mills asked him: "Why leave it all to the Manor?" Whereupon, McCaslin replied: " 'They have treated me better than I have ever been treated before. Why shouldn't I?' and words to that effect."

The decedent asked Mills to draw the will for him and was told "that a Will like that should be handled by an attorney." Mills further testified:

"Q  Did you recommend any particular attorney to him?

"A  I mentioned several in Oregon City, and finally, after several times, his coming up frequently, I told him, I said, 'Why don't you get the attorney for the Manor because they know the names and the proper way of mentioning who you want to give it to?'

"A  Did you know who the attorney for the Manor was?

"A  I did.

"Q  Did you tell him the name of that particular person?

"A  I sent him to Mr. Biggs. I talked to him about Mitchell and Jack and quite a number of them. I don't know who all, but I ended up by telling him, 'If you want to give it to the Manor, why don't you have their attorney make it out?'

"Q  You told him that Mr. Biggs was the attorney for the Manor?

"A  I did. Paul Biggs."

Thus, we learn from Mr. Mills of the existence of McCaslin's predetermined plan to favor the Manor, and also that McCaslin knew prior to his contact with Biggs that Biggs was attorney for the Manor.

Just how much time elapsed between the decedent's conversation with Mills concerning attorneys and his first meeting with Mr. Biggs we do not know, but

we are certain that such meeting occurred about August 2, 1955. It appears that Mr. Biggs, as counsel for the Manor, had been coming there with some regularity once a week to give attention to its business and see such members as had requested him to call upon them.

The attorney described his first contact with the testator as follows:

"A   I had been out at the Willamette View Manor that day with my secretary seeing some other people. The hour had gotten to about 5:30 or quarter to 6:00 and my secretary picked up her equipment and had gone out to the car. I was walking down the hall past the telephone operator's place when Mr. McCaslin asked me if my name was Biggs, and I said it was, and he said he wanted to see me, and then I went into an office there I had been using during the day, and that was the first occasion I met him.

"Q   Whose office was that that you went into?
"A   It was an office that wasn't being used, or being used for various things, but one that I had been using off and on when I was out there.

"Q   When you met Mr. McCaslin did he just say he wanted to see you?
"A   No. He then told me what he wanted and so forth.

"Q   All right. Would you tell us what he said?
"A   Yes. He stated to me that he wanted to make a Will and stated he wanted to leave his property to the Oregon Methodist Homes, Incorporated. I then asked him if he were married and he said No, he had never been married and was not married, and I said, 'Never married?' And he said, 'No,' and I said, 'Then you have no children?' He said, 'That's right.' He said at that time, I believe some statement about having a brother was

my understanding, but that he owed him nothing and the brother owed Mr. McCaslin nothing; so he wanted it to go to the Manor. I told him then it would be impossible for me to make the Will at that time because it was just at the dinner hour; quite a bit of confusion and would it be all right if I drafted it and brought it back to him, and that was all right."

Mr. Biggs was unable to see his client until two weeks later, i.e., Monday, August 15, 1955, when he returned to the Manor with the draft for Mr. Mc-Caslin's approval. He gives the following account of what then transpired:

"Q Where did you meet him on that Monday?

"A The same place. I called him and when I came in the door he was in the first floor where they have lounge room and he saw me and came forward.

"Q And now would you tell us just in your own words what happened then?

"A Yes. My secretary was with me and we shook hands and went into the room there and I said that I had brought the Will or the instrument he had asked for and that I had brought my secretary and would it be all right for she and I to act as witnesses. I introduced my secretary to him and he shook hands with her and she talked a few minutes, and he said, 'all right,' that's what he wanted to do. I handed the Will to him and he sat down at the desk and read it. When he finished he said, 'That's what I want.' Then he started to sign. Before he did I said, 'I want you to answer is this your Last Will and Testament?' He said it was. He signed it. I then put my signature to it and Miss Martin put her signature to it. The Will was handed to him, I believe, or some arrangement was made that moment that he said he wanted me to have the Will in my possession. I put it in an

envelope and sealed it and took it back. I think there were a few side remarks about was he going to take a trip, and he said, 'No.' He had been in the railroad and traveled long enough. He was making no more trips. He was satisfied here. But a few pleasantries and that was all.

"Q Was that the last time you saw him?

"A That's the last time. I saw him various times there, but only to say Hello. He never talked to me and I never talked to him."

Miss Marie Martin, secretary to Mr. Biggs, confirmed his report of what occurred on August 15, 1955. The record is void of anything contradicting the attorney's account of his two meetings with Mr. McCaslin.

Mr. Mummery, known as the administrator of the Manor and its top executive in charge of operations, swore that he never discussed a will with Mr. McCaslin and did not even know of his nomination as its executor until after the testator's death.

Walter Higgins, Mr. Mummery's associate administrator, denied having ever discussed with decedent his property or its extent and had no memory of ever discussing the matter of a will with him. He, too, knew nothing of the will's provision naming him as an alternate executor until after decedent died.

■ We find no evidence to warrant an inference that any person as an officer of the beneficiary corporation or any party acting in its behalf participated directly or indirectly in molding McCaslin's intention to favor the Manor. True, Mr. Biggs was at the time both its attorney and secretary, but in his relationship to Mr. McCaslin we find his conduct above reproach and it is apparent that he had no part in the formulation of the testator's plan, previously and independently con-

ceived, for the devolution of his estate at his death. The attorney's function in the instant matter was no more than a scrivener to place the testator's wishes in due form.

We have already alluded to McCaslin's long-continuing satisfaction with the Manor. So, too, was it with the pattern of his will as made in August, 1955. The witness Mills also reports his conversations with McCaslin after the will was executed. He tells us:

"A  *  *  *  I tried to get him to—afterwards I discussed it with him at different times if he didn't want to change it and give some to the other ones. That's after it was made.

"Q  When you say other ones, who do you mean?
"A  Like the Blue Cross or the Cancer Fund or like that. He says, 'No. My mind is made up. You can't change me.'

"Q  When was that, Mr. Mills?
"A  Well, even up until in '57. The next year. A year afterwards, or so, after I handled his income tax the second time. I said, 'Are you going to break down and give the Odd Fellows something?'

"Q  What did he reply?
"A  He said, 'Nope.' He says, 'I have got my mind made up.' He says, 'I have done enough,'
*  *  *."

■ Nor did he change his will or threaten to do so in the period of nearly two years which ensued before his death, a cogent circumstance bearing on the question of undue influence. See 94 CJS 1143, Wills § 261, reading:

"Although conclusive weight should not be given it, the fact that a testator having the capacity and ability to do so failed for a substantial period of time to change or revoke a will alleged to be the

product of undue influence negatives the claim of undue influence."

See, also, 57 Am Jur 312, Wills § 439. This court has spoken to the same effect in *Laberee v. Laberee,* 112 Or 44, 53, 227 P 460, 228 P 686, with respect to a will which also continued unchanged for two years prior to the testator's death, calling it "strong evidence that he [the testator] was not coerced into making it, but that it was entirely satisfactory to him when made and that that satisfaction continued until his death."

The circuit court is affirmed.